LIPTON PROFESSIONAL SOCCER, INC. & another *vs.* BAY STATE HARNESS HORSE RACING AND BREEDING ASSOCIATION, INC. & others.

Suffolk. September 12, 1979. — October 18, 1979.

Present: HALE, C.J., GOODMAN, & KASS, JJ.

*Contract*, Interpretation. *Real Property*, Restriction, Covenant running with the land, Covenant against competition.

Viewed in light of the circumstances existing at the time of execution and delivery of a lease and in the context of the entire lease and related documents, a provision in the lease whereby the tenant, which was to construct a stadium on the demised premises, covenanted that it would not permit a public event to be held during those hours when the "Landlord first named herein" was conducting harness racing on the retained portion of the premises was appurtenant to and ran with the racetrack land and was enforceable by the original landlord's successors in interest. [462-467]

---

CIVIL ACTION commenced in the Superior Court Department on February 22, 1979.

The case was heard by *Dimond, J.,* on motions for summary judgment.

*Reginald H. Howe* for Lipton Professional Soccer, Inc.

*Robert L. Caporale* for Stadium Realty Trust.

*Earle C. Cooley (James C. Burling* with him) for Foxboro Associates & others.

*Richard A. Gelerman* for the town of Foxborough, submitted a brief.

HALE, C.J. The complaint, which tests the force of lease provisions under which play dates at Schaefer Stadium may be restricted, was brought by Lipton Professional Soccer, Inc. (Lipton), and by Stadium Realty Trust (Stadium), a Massachusetts business trust (G. L. c. 182). The defendants are Bay State Harness Horse Racing and Breeding Association, Inc. (Bay State); Foxboro Associates (Foxboro), a limited partnership, of which the defendant EJK, Inc., is a corporate general partner; New England Harness Raceway, Inc. (Raceway); and the town of Foxborough (Town).

The complaint is in two counts; this appeal concerns only the first, by which the plaintiffs seek a declaratory judgment that Foxboro Associates and Raceway have no rights under a certain lease from Bay State to Stadium. Lipton and Stadium each filed a motion for summary judgment as to count 1, and Foxboro, EJK and Raceway jointly filed a similar motion in which Bay State has joined.[1] The motions were heard on the pleadings, certain affidavits and a stipulation as to documentary exhibits. The scope of the hearing was confined to whether Article X of a lease from Bay State to Stadium "considered in the light of the circumstances existing at the time of its execution, contained an unambiguous restrictive covenant that was enforceable by a subsequent grantee

---

[1] The Town did not file on its own behalf or join in any motion for summary judgment.

and tenant of Bay State's retained racetrack."[2] Judgment was entered pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974), making a declaration favorable to all of the defendants except the Town. The plaintiffs and the Town have appealed. We summarize the facts, none of which are in dispute, leaving further details for later discussion when necessary.

For some time before 1970, Bay State was the owner of a large tract of land in the town of Foxborough on part of which was a racetrack and parking lot used by Bay State to conduct its business of harness horse racing. Sometime prior to May 25, 1970, the area was selected as the potential site for a stadium in which the New England Patriots would play their home football games. Bay State, Stadium, the Town and the Patriots came to an agreement which would have Bay State lease a fifteen acre portion of its land to Stadium for a term of fifty years. Stadium would build the stadium facility which, in turn, it would sublease to the Patriots, and would have the right to sublease to others. On completion of the financing of the facility, Bay State would convey the fifteen acres to the Town (provided a town meeting voted to accept the conveyance subject to the stadium lease). Bay State would also lease land to Stadium for parking automobiles, while retaining the racetrack and the parking facilities used in connection with the track.

---

[2] Article X of this lease, to which the parties ascribe differing interpretations, states:

"The Tenant covenants with the Landlord . . . that the Tenant will not permit any public event to be held within the stadium to be constructed upon the demised premises during those hours of the day when the Landlord first named herein is conducting its business of harness horse racing pursuant to a license granted to it by the State Racing Commission of the Commonwealth of Massachusetts, without the prior written consent of the Landlord first named herein, and that the Tenant will not commit any nuisance upon the demised premises and will not carry on any trade or occupation thereon or make any use thereof which will be unlawful, or contrary to any valid law or valid ordinance for the time being in force."

All documents necessary to implement this plan, or notices of them, were recorded together in the Norfolk County registry of deeds on September 30, 1970. These documents were: (1) a fifty-year lease of the fifteen-acre stadium site, dated May 25, 1970, from Bay State to Stadium (the Stadium Lease); (2) a thirty-year sublease, dated May 25, 1970, of the approved site from Stadium to the Patriots (the Patriots Sublease); (3) a fifty-year lease of land solely for parking purposes from Bay State to Stadium (the Parking Lease), dated May 25, 1970; (4) a deed of the stadium site dated September 30, 1970, from Bay State to the Town (subject to, among other things, the Stadium Lease and the Patriots Sublease); and (5) an assignment to the Town of Bay State's interest in the Stadium Lease dated September 30, 1970.

By deed dated November 30, 1976, Bay State conveyed the racetrack and certain other real estate, including the various parking areas, to Foxboro (the Racetrack Deed) and on December 1, 1976, Foxboro leased the racetrack facilities to Raceway (the Racetrack Lease). Since that time Bay State has not engaged in the business of harness horse racing at the racetrack.

On March 18, 1978, Stadium entered into a sublease with Lipton (the Lipton Sublease). Lipton's soccer team, the New England Tea Men, played its 1978 games in the stadium, including four which conflicted with racing dates; those four were played with Raceway's permission. In late 1978, the State Racing Commission granted to Raceway additional racing dates. At about the same time the Tea Men announced their 1979 home game schedule, which called for fifteen home games on Wednesday and Saturday evenings from April 28 to August 4, 1979. All but one of those dates conflicted with dates on which Raceway was to conduct horse races. In a letter dated December 5, 1978, an attorney on behalf of Foxboro and Raceway informed Stadium and Lipton that as successor in interest to Bay State, Foxboro would take legal action to enforce its rights under the Stadium Lease "to prevent

the holding of a public event within Schaefer Stadium without the prior written approval of Foxboro Associates during those hours when the Tenant of Foxboro Associates, New England Harness Raceway, Inc. is conducting its business of harness racing . . . ." The present action ensued.

No party to this appeal now disputes that the covenant in Article X of the Stadium Lease reserved to Bay State at least a personal right of approval which it could exercise as long as it owned the racetrack. Lipton, Stadium and the Town argue that when Bay State divested itself of title to the racetrack whatever rights it had under the covenant expired. On the other hand Foxboro and Raceway claim that the terms of the Stadium Lease, and those of the contemporaneous documents, viewed in light of the circumstances existing at the time of the execution and delivery of the Stadium Lease, require a construction that the covenant ran with the land and was exercisable by Foxboro and its tenant, Raceway. Thus, the issue determinative of this case is whether the restrictive covenant in Article X of the Stadium Lease was personal to Bay State or whether it is appurtenant to the racetrack land and enforceable by Foxboro as Bay State's successor in title.

As the resolution of this issue involves the interpretation of a contractual document we are to be guided by the rule stated in *Dittemore* v. *Dickey*, 249 Mass. 95, 104-105 (1924): "Every instrument in writing is to be interpreted, with a view to the material circumstances of the parties at the time of the execution, in the light of the pertinent facts within their knowledge and in such manner as to give effect to the main end designed to be accomplished. . . . [The] instrument is to be so construed as to give effect to the intent of the [parties] as manifested by the words used illumined by all the attendant factors, unless inconsistent with some positive rule of law or repugnant to other terms of the instrument. An omission to express an intention cannot be supplied by conjecture. But if the

instrument as a whole produces a conviction that a particular result was fixedly desired although not expressed by formal words, that defect may be supplied by implication and the underlying intention of the [parties] may be effectuated, provided it is sufficiently declared by the entire instrument."

We also have in mind that "[a] contract is to be construed as a business transaction entered into by practical men to accomplish an honest purpose in accord with common sense." *Kennedy Bros.* v. *Bird*, 287 Mass. 477, 483 (1934). That is, we must give a contract the practical construction it deserves. "A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together." Restatement of Contracts § 235(c) (1932). See also § 235(d).

The significance of the words "Landlord first named herein," as appearing in Article X of the Stadium Lease, is not clear when viewed in isolation, as the plaintiffs would have us do. Observing the rules of construction set out above, we have examined the other articles to determine, if possible, the meaning the parties intended those words to have. In doing so we have kept in mind that at the time the Stadium Lease was executed Bay State was the owner of a racetrack and the parking lots which served its clientele, the fifteen acres covered by this lease upon which a stadium was to be built, and the land to be leased simultaneously for parking purposes under the Parking Lease. We have found that throughout the lease the draftsman used the word "Landlord" without description or limitation where that word applied equally to Bay State as the owner of the fifteen acres and to its successors in title to the stadium parcel, or where descriptive words were unnecessary. But where it was necessary to describe the landlord with respect to its interests in other parcels or as applying only to the landlord as subsequent owner of the racetrack premises, the draftsman did so. Once these different landlord interests referred to in the lease are recognized, the pattern of the descriptions

464                                                8 Mass. App. Ct. 458

Lipton Prof. Soccer, Inc. *v.* Bay State Harness Horse Racing & Breeding Assn., Inc.

becomes clear and leaves us with no doubt that the answer to the single issue before us is that the Tenant's covenant with the Landlord in Article X is appurtenant to, and runs with, Bay State's racetrack land and is enforceable by Bay State's successors or assigns.

The lease in its initial paragraph states that Bay State will be referred to as the "Landlord." No one questions that the "Landlord first named herein" is also Bay State. Other articles in the lease describe and limit "Landlord" by those same words and by others such as "Landlord herein" and "Landlord hereunder." We summarize some of those articles.

Article II limits the use of the demised premises to the construction and operation of a stadium of not less than 50,000 seats, and states in part, "The stadium shall be initially subleased by Tenant to [the Patriots] pursuant to and in accordance with the terms of a certain Indenture of Sublease of even date and execution herewith between the Tenant, as Landlord, and the Patriots, as tenant." We note that the landlord here is clearly not Bay State.

In Article VI, the subject of which is "Taxes," it is noted that the Town voted to accept a gift of the fee of the demised premises, which were subject, among other things, to the Stadium Lease. The vote is also described as containing a provision prohibiting the assessment of real estate taxes on the stadium land and on any improvements thereon for a term of fifty years. The article then provides for the payment of taxes, should any be assessed, allocating such taxes or credits due for their payment, by several descriptions: "Tenant as Landlord" (Stadium under the Patriots Sublease), "Landlord hereunder" (Bay State) and "Landlord."

Article VII concerns plans for the construction of the stadium. Among other things it provides, "the Tenant agrees to submit such plans and specifications to the Landlord and the Patriots for approval." The concluding paragraph of Article VII contains the only reference to "Landlord first named herein" outside of Article X and

8 Mass. App. Ct. 458                           465

Lipton Prof. Soccer, Inc. v. Bay State Harness Horse Racing & Breeding Assn., Inc.

reads, "Anything contained in this Article VII hereof to the contrary notwithstanding, it is expressly understood and agreed that the Tenant shall not engage in the construction of the stadium in such a manner as to interfere with the operation by the Landlord first named herein of its business of harness horse racing pursuant to a license granted to it by the State Racing Commission of the Commonwealth of Massachusetts."

The word "Landlord" in Article XIV refers not only to the owner of the leased premises but also to the owner of the parking areas.

Article XXII is significant as it calls for the Landlord to provide at the request of the Tenant certain easements over portions of "Landlord's land surrounding, abutting, contiguous and/or adjacent to the demised premises." As some of those easements would very likely be requested after Bay State conveyed the stadium land to the Town, "Landlord" here must refer to the owner of the adjoining racetrack land and not just of the stadium land. The concluding paragraph of Article XXII (set out in the margin[3]) recognizes Bay State's ongoing need to protect the "full and free use" of the land adjoining the stadium parcel during the construction of the stadium. Article XXII uses "Landlord" and not "Landlord first named herein," as the article affords protection to land covered by the Parking Lease as well as the racetrack property. It stands with Article VII as a demonstration of the parties' intent to protect the racetrack premises from interference.

---

[3] "During the period of construction of the stadium on the demised premises, the Tenant, its agents, employees and contractors shall have the right to operate equipment and transport materials in vehicles and on foot to and from adjoining lands of the Landlord in connection with the construction of the stadium facilities, provided, however, that said right to pass to and from adjoining lands of the Landlord shall be exercised so as not to interfere unreasonably with the free and full use of said adjoining land of the Landlord."

In sum, we see the use of the word "Landlord" without particularity throughout as referring to differing landlord-tenant relationships but in the main as referring to the owner of the stadium land, and we see the word used with descriptive language where it is necessary to restrict its application to a particular interest. This brings us to Articles XXVIII and XXX. Only the final paragraph of Article XXVIII is of present concern, and we set it out in the margin.[4] Article XXX provides, "*Except to the extent otherwise specifically provided herein,* all the terms and conditions of this Lease shall be binding upon and inure to the benefit of the Landlord and the Tenant and their respective successors and assigns" (emphasis supplied).

We read "Owner" and "Landlord" in the last paragraph of Article XXVIII as referring to Bay State as the stadium owner and landlord, and "Tenant" as referring to Stadium as tenant, and we read the paragraph as extending the benefits and responsibilities of such relationships to their successors and assigns. Article XXX does not limit the interests of landlord and tenant to which the successors and assigns succeed as its provisions are in general terms. We conclude that the words of Article XXX extend the obligations and benefits of the Lease to those landlords and tenants who are not owners or lessees of the stadium property. Even though the word "Landlord" is sometimes used with a descriptive phrase, the person so referred to is no less a "Landlord." Construing it otherwise would render Article XXX redundant. That article is just a short two-sentence article removed from Article XXVIII. Such a result was surely not intended by the parties to such a carefully worked out document.

---

[4] "The terms 'Landlord' and 'Tenant' whenever used herein shall mean only the Owner at the time of Landlord's or Tenant's interest herein, and upon any sale or assignment of the interest of either the Landlord or Tenant herein, their respective successors in interest and/or assigns shall, during the term of their ownership of their respective estates herein, be deemed to be Landlord or Tenant, as the case may be."

Moreover, the descriptive phrase "first named herein" is used only in the two lease provisions which protect the interests of Bay State against interference with its harness horse racing business. Article VII's protection of Bay State's horse racing business was only a temporary measure during construction, but the extended protection of that business afforded by Article X was, and is, of great importance to maintaining the value of the racetrack as a going concern. It is highly improbable that Bay State intended this value to be maintained while it was the owner of the track without safeguarding against the depreciation of that value should it sell the track, a not unlikely event in the course of fifty years, or that Stadium failed to recognize this interest.

We note, too, that the Patriots Sublease contains a covenant, which was a condition to the validity of the sublease, "that [the Patriots] will neither schedule nor play any football games within the stadium to which the public is invited during those hours in the day when Bay State, or its successor, is conducting its business of harness horse racing . . . ." This covenant is repeated verbatim in the recorded notice of the sublease. The Parking Lease is made subject to this condition in the following language: "However, within the term aforesaid, Tenant's right to use the Demised Premises for the purpose of parking motor vehicles shall be limited solely to those dates when public events are staged or held within the stadium pursuant to the terms of the Stadium Lease."

As we indicated earlier, we conclude that the lease provides that the covenant in Article X inures to the benefit of Bay State's racetrack land and runs with it to Bay State's successors and assigns.[5]

We agree with the memorandum of decision of the judge below wherein he wrote, "Upon consideration of

---

[5] Although it is not essential to our decision, it is interesting to note that the conduct of the parties up to the institution of this action is consistent with this view.

the record, we are satisfied that the 1970 transaction involved a 'common scheme,' as that term is used in *Snow v. Van Dam*, 291 Mass. 477, 481-485 (1935), and similar cases. *Canty* v. *Donovan*, 361 Mass. 879 (1972); *Guillette* v. *Daly Dry Wall, Inc.*, 367 Mass. 355 (1975); *Cogliano* v. *Lyman*, [370 Mass. 508, 512 n.9 (1976)]. That the parties intended the restriction in Article X of the Stadium Lease to be appurtenant to Bay State's remaining land can be inferred from the relation of the Stadium premises to the racetrack and from the unified manner in which the 1970 transaction was handled. We believe that the facts demonstrate that there was created a system dependent on recognition and enforcement of mutual rights and obligations to maintain the character of the Stadium and the racetrack in a mutually advantageous manner. We are satisfied, therefore, that the covenant in Article X is one that does 'touch and concern' the racetrack and is appurtenant to it. *Gulf Oil Corp.* v. *Fall River Housing Authy.*, 364 Mass. 492, 499 (1974)."

Even if the covenant was against competition (it does limit competition for use of the crowded highways, for parking space and perhaps to some extent for customers), it would not be invalid on the facts here. We have held above that the parties intended the covenant to run with the land; that the covenant "touched and concerned" the land; and that it was part of a common development scheme. We also hold that the covenant is "one which is consistent with a reasonable over-all purpose to develop real estate for commercial use." *Whitinsville Plaza, Inc.* v. *Kotseas*, 378 Mass. 85, 98 (1979).[6]

One further question has been argued — whether Foxboro can enforce the Article X covenant as it does not now operate the racetrack and is not the holder of a racing license.

---

[6]The holding of this case was effective retroactively to June 13, 1967. *Whitinsville Plaza, Inc.* v. *Kotseas*, 378 Mass. at 94 n.8, 98.

Part (2) of the judgment orders that Lipton shall not, "without the prior written consent of Raceway . . . permit soccer to be played on the premises covered by the Stadium Lease during those hours of the day when Raceway is conducting the business of harness racing on its neighboring premises pursuant to a license granted to it by the State Racing Commission . . . ." This is the correct order in the circumstances. Raceway as lessee of Foxboro is a successor or assignee, and as such is protected by the Article X covenant.

*Judgment affirmed.*