## Well-Built Homes, Inc. *vs*. Richard Shuster.

No. 04-P-639.

Suffolk. February 25, 2005. - September 29, 2005.

Present: Duffly, Kaplan, & Dreben, JJ.

*Real Property,* Covenant running with the land, Restrictions. *Subdivision Control,* Conditions.

This court concluded that a covenant to permit the imposition of future restrictions on certain subdivision lots in a residential development ran with the land, because the intent that the benefit of the covenant would run with the land on which those lots were located was apparent from the documents creating the covenant and the circumstances and history of the transaction [626-634]; however, this court remanded the case to the Land Court for further proceedings regarding the nature and extent of the possible restrictions to be created [634-637].

Civil action commenced in the Land Court Department on October 25, 2001.

The case was heard by *Charles W. Trombly*, J., on motions for summary judgment, and entry of separate and final judgment was ordered by him.

*Eric Wodlinger* for the plaintiff.

*Diane C. Tillotson* for the defendant.

Duffly, J. By a partial summary judgment of the Land Court, various aesthetic and architectural restrictions and a prohibition against further subdivision of lots in a residential development were held not to apply to two lots owned by the defendant Richard Shuster.[1] We reverse the portion of the judgment that declared that a covenant to permit the imposition of future restrictions does not run with the land. As to the declaration that Richard's lots are not subject to the restriction against further

---

[1] Richard Shuster is the defendant in the primary litigation and the plaintiff in related litigation, as seen below.

subdivision, we vacate that judgment and remand for further proceedings.

1. *Facts.* The undisputed facts, as set forth in the memorandum and decision of the Land Court and as augmented by the undisputed portions of the record, are as follows.

In 1988, Richard Shuster and his then wife, Barbara Shuster, proposed a subdivision plan for a parcel of land they jointly owned in the town of Dartmouth, creating twenty numbered lots plus one (Parcel A, designated by them as unbuildable) called the Liberty Tree Subdivision. With a single exception, the lots ranged in size from 32,259 to 82,791 square feet. The single exception, Lot 20, was 227,091 square feet. The Liberty Tree plan was approved by the Dartmouth planning board in 1988 and recorded in the registry of deeds. The Shusters retained adjacent land that was not part of the subdivision.

In the same year, Barbara commenced proceedings seeking a divorce from Richard. The judgment of divorce nisi, which became absolute on December 24, 1990, incorporated a separation agreement[2] of the parties calling for the transfer to Richard of adjoining Lots 5 and 20. Lot 20 included the marital residence.[3] The agreement assigned the remaining lots and some additional real estate to Barbara.

In their agreement, the Shusters agreed to convey to Richard, along with the Lots 5 and 20, easements to use a street shown on the subdivision plan as Liberty Tree Drive and to provide access, sewer service, and utilities to "the parcels" conveyed. The agreement also reflected the Shusters' understanding "that there will be restrictions and obligations imposed upon all the buildable lots in the . . . Liberty Tree subdivision which have yet to be prepared." To ensure that Richard's lots would continue to be included in the subdivision for such purposes, the Shusters'

---

[2] We refer from time to time in this opinion to the separation agreement, meaning thereby to encompass the specific terms of the agreement, although the agreement may have merged in the judgment — the record is silent on this and therefore the agreement may have ceased to have any independent legal significance. *Stansel* v. *Stansel*, 385 Mass. 510, 512-514 (1982). *DeCristofaro* v. *DeCristofaro*, 24 Mass. App. Ct. 231, 235 (1987).

[3] Lot 5, at 34,338 square feet, was one of the smaller lots in the subdivision, whereas Lot 20, at 227,091 square feet, was significantly larger than any others.

agreement stated that Richard would either "(a) take title of Lots 5 and 20 subject to any and all obligations and restrictions as are imposed upon all of the buildable lots in the subdivision, or" — if such conditions were not yet imposed at the time he took title — "(b) execute any and all documents reasonably required to subject said Lots 5 and 20 to those restrictions in the event that they are imposed on the balance of the buildable lots . . . subsequent to [that time]."

The agreement stated that the imposition of any restrictive covenants on Lots 5 and 20 was contingent upon two conditions: first, that the restrictions would be "consistently applied in a non-discriminatory manner to all of the buildable lots in the subdivision"; and second, "that the restrictions and obligations that will be imposed on the Liberty Tree Subdivision shall apply to Lot 20 only to the extent that new structures are added to the property or existing structures are rebuilt or expanded." The separation agreement provisions relating to the transfer of their real estate and notice of the divorce judgment were recorded by Richard in March, 1993.[4]

The record on appeal reflects nothing further until January 11, 1999, when Barbara entered into a purchase and sale agreement with a developer, Well-Built Homes, Inc. (Well-Built), for the transfer of her lots in the Liberty Tree development, that is, all lots save 5 and 20. Barbara was to deliver a deed in consideration of $701,003 within thirty days after she secured the necessary approvals for changes Well-Built sought in the subdivision plan, namely a reconfiguration of the tract reducing the number of buildable lots and thereby creating some lots larger than those in the original subdivision plan.

Over the next several months, Barbara, at the behest of Well-Built, instituted such amendments. In April, 1999, the planning

---

[4]See G. L. c. 183, § 43 ("Whenever a final decree in equity shall be made by the . . . probate court . . . directing that a deed, conveyance or release of any real estate or interest therein shall be made," and a party fails so to do as directed, "the decree itself shall operate to vest title to the real estate or interest in the party entitled thereto . . ."); G. L. c. 208, § 34A (same, with respect to judgment of divorce directing a party to make a deed, conveyance or release of real estate in lieu of alimony). Assignment of the real estate was, as stated in the separation agreement, "in lieu of alimony." Provisions for recording of such judgments are governed by G. L. c. 184, § 15.

board approved a revised Liberty Tree plan, which encompassed the land to be conveyed to Well-Built by Barbara. The revised plan did not include Liberty Tree plan Lots 5 and 20. Shortly thereafter, Barbara renamed the subdivision "The Woods at Padanaram Village" (Woods plan). The resulting definitive subdivision plan now contained fifteen numbered buildable lots, plus Parcel A, still designated as unbuildable. The layout of these lots was based upon the 1988 Liberty Tree plan but was divergent in several respects: in particular, two of the buildable lots, Lots 7 and 11, now exceeded 140,000 square feet. The planning board endorsed the Woods plan in August, 1999.

Also in August, 1999 — nine years after the Shusters' divorce and six years after Richard recorded the divorce judgment — the Shusters as joint owners executed two deeds. The first deed conveyed to Richard Lots 5 and 20 of the original Liberty Tree plan, in terms similar to the provisions of the separation agreement. The second deed conveyed to Barbara the remaining lots shown on the 1988 plan as well as some additional land they owned.

Both deeds, which refer only to the 1988 Liberty Tree plan, were recorded on August 9, 1999, the date the Woods plan was finally endorsed by the planning board.[5] On September 1, 1999, Barbara conveyed her land — encompassing the tract shown on the Woods plan, plus some additional territory — to Well-Built.

Well-Built, as developer of the Woods plan, executed a declaration of covenants and restrictions (declaration) on August 1, 2000, subjecting itself and its successors to conditions designed "to provide for an attractive, aesthetically compatible development." This declaration contained a restriction that is primarily at issue in this appeal.[6] The restriction bars further subdivision of any lot without prior written approval

[5]Richard disclaims any knowledge of Barbara's plans to convey her Liberty Tree lots or her dealings with Well-Built and the planning board as of the time he signed the deeds. Richard denies he received a letter, dated August 5, 1999, from James Holding, Well-Built's President, advising Richard — purportedly in response to his inquiry — that Well-Built intended to proceed with the Woods development and acknowledging Richard's need for access to Lot 20 during construction. We do not consider this disputed fact to be necessary to a resolution of the matter.

[6]Other restrictions contained in the declaration relate to aesthetic design

from Well-Built. In addition to enumerating the restrictions, and reserving Well-Built's right to amend them, the declaration states that the restrictions are limited to the Woods plan; that Well-Built and its successors and other Woods lot owners may enforce the restrictions; and that the restrictions expire in thirty years unless extended by majority vote of the lot owners. The declaration concludes that the purpose of these restrictions is to protect the investment of Woods owners and to create architectural harmony.[7]

On August 7, 2000, Well-Built filed an approval not required (ANR) plan making further changes to the Woods plan, namely the incorporation of a small plot of adjacent land purchased from one David DeMello and the redivision of Lots 9 through 12 adjoining that land.[8] Two buildable lots were added in this process, one of them from the conversion of Parcel A to Lot 10B. The final Woods plan contains a different configuration than the original Liberty Tree plan. The revised Woods plan does not include Richard's Lots 5 and 20 and it encompasses property (the DeMello parcel) not part of the Liberty Tree plan. Both the declaration and the ANR plan were recorded on August 8, 2000.

In May, 2001, Richard submitted an ANR plan, later recorded, for division of adjoining Liberty Tree plan Lots 5 and 20 into multiple lots. Lot 5, with the incorporation of some land from Lot 20, would be divided into Lot 16, measuring 25,523 square feet, and Lot 16A, at 20,019 square feet. Lot 20 would be divided into Lot 20, containing the pre-existing house and measuring 142,159 square feet; Lot 20A, at 33,215 square feet; and Lot 20B, at 40,514 square feet.[9] Lot 20B was to contain a tennis court and was designated as an unbuildable lot that could

---

and architectural control governing the size and type of single-family dwelling that may be constructed on the lots.

[7] At the time it recorded these restrictions, Well-Built says, it intended to impose them only upon the actual Woods plan and did not foresee the potential impact on Richard's land.

[8] One of the two disproportionately large lots, Lot 11, was divided into two lots of similar size, Lots 11A and 11B — the latter designated on the plan as unbuildable and to be used for drainage.

[9] Compare the final Woods subdivision, in which three of the Woods lots are under 35,000 square feet and two others under 40,000. Richard's Lots 20A and 20B are thus consistent in size with these in the Woods tract, although

only be conveyed with one of the other lots. Richard then entered into an agreement to convey the new Lot 20, with the house, to one Marvin Harris for $1,011,200.

In preparation for closing, the buyer's attorney raised the issue whether the restrictions recorded by Well-Built applied to the parcel to be sold to Harris. Richard asked Well-Built to sign a release.[10] In response, Well-Built executed and recorded a clarification of covenants and restrictions, containing the assertion that Liberty Tree plan Lots 5 and 20 were bound by the restrictions set forth in the declaration. Thereafter, at the advice of a title insurer, Richard obtained from Barbara a release from the provisions of the deeds allowing the imposition of common restrictions on his land; he signed a similar release in favor of Barbara.

2. *Prior proceedings.* Well-Built filed a complaint in the Land Court on October 25, 2001, alleging that Richard had violated the prohibition against further subdivision, and that the reconfigured lots derived from Lots 5 and 20 are "not in keeping with the general presentation and dress of the subdivision and are substantially smaller than the average size of lots." This, Well-Built claimed, "detracts from the subdivision and diminished the value of the other lots in the subdivision, all to the harm of [Well-Built]." Well-Built sought (1) a declaration that Richard's land is subject to the restrictions imposed on the Woods plan and that subdivision of Lots 5 and 20 violated the restriction against further subdivision; (2) a declaration that only one of the parcels carved from Lot 5 is entitled to use of the easements described in the deed to Richard; (3) an injunction preventing Richard from selling or conveying the subdi-

Lots 16A and 16B are still smaller than the smallest Woods lots.

[10]Well-Built says that this inquiry first alerted it to provisions in the 1999 deeds and the separation agreement that Well-Built claims subject Richard's lots to the declaration. See note 7, *supra.* However, as seen in our text, the deed from Barbara to Well-Built purported to convey appurtenant rights reserved in the deed to Richard, which Well-Built now claims included its right to impose restrictions on his lots. In addition, it appears that Well-Built received notice of the relevant language in the deeds. Well-Built's assertion is, in any case, legally irrelevant since it is charged with constructive notice of the contents of the recorded separation agreement and deeds.

vided lots; and (4) damages for the diminished value of the Woods project.[11]

In his answer, Richard asserted that any right to impose restrictions on his lots was personal to Barbara, who had released him from such obligations, and did not extend to Well-Built. Richard brought a counterclaim seeking a declaration that his land is not subject to the restrictions imposed by Well-Built upon the Woods development, including the prohibition against further subdivision.

Richard also filed a separate complaint against Well-Built in the Superior Court on November 26, 2001, claiming that, after giving assurances that his land was not subject to restrictions intended for the Woods subdivision, Well-Built wrongfully obstructed the sale to Harris in order to extort payment for a waiver of the declaration. He also claimed that Well-Built initiated its Land Court complaint for the same ulterior motive. Richard's claims for damages, set out in five counts, asserted slander of title, tortious interference with contract and with an advantageous business relationship, abuse of process, and violation of G. L. c. 93A.

The cases were later consolidated, with a Land Court judge sitting by special designation over the Superior Court case pursuant to G. L. c. 211B, § 9, and the parties brought cross-motions for partial summary judgment on the sole issue whether the restrictions are applicable to Richard's land. The question in contention before the Land Court judge was whether the benefit of the Shusters' covenant to subject Richard's lots to future restrictions ran with Barbara's land upon the sale to Well-Built. Richard sought a declaratory judgment that neither the declaration nor the clarification worked to burden Liberty Tree plan Lots 5 and 20 and that any right specified in the August 5, 1999 deeds to create restrictions upon them had been released. Well-Built, in turn, sought a declaratory judgment that Lots 5 and 20 were subject to all of the restrictions Well-Built had imposed on the Woods development and that it could enforce on those lots the prohibition against further subdivision.

---

[11]By the time of the judge's ruling, Well-Built had sold all but two of the lots in the Woods development — Lot 10B, tied up in litigation, and Lot 11B, designated as unbuildable.

Based primarily on his interpretation of the deeds executed on August 5, 1999, the judge determined that the right to impose restrictions was personal to Barbara. Proceeding from the basic principle disfavoring restraints on alienation, the judge determined that the terms of the deeds were insufficient to meet the prerequisites for the covenant to run with the land. The judge noted that although Richard agreed that certain restrictions would apply to his land, his deed did not expressly grant to Barbara's successors in title the right to impose them and that, therefore, any right to impose future restrictions was personal to Barbara, who had released the right.

On March 2, 2004, a separate and final judgment entered in Richard's favor, pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974), declaring that Well-Built did not have the right to impose restrictions on his lots.[12] Well-Built appeals.

3. *Discussion.* In our view, the Shusters' intent that the benefit of the covenant (the right to impose certain restrictions on Richard's land) would run with Barbara's land is apparent from the documents creating the covenant and the circumstances and history of the transaction. We also conclude that the Shusters intended that restrictions be imposed by Barbara or those succeeding to her interest. These conclusions do not resolve, however, a further question regarding the nature and extent of the original right possessed by Barbara and devolved upon Well-Built. Because the Land Court judge was not asked to address this issue, and because neither party has addressed it in this appeal, we will remand it for initial determination by the Land Court.

a. The parties are in agreement that the requirements for a covenant to run with the land are that (i) the covenants must be evidenced in a writing signed by the covenantor (here, the Shusters); (ii) the deeds must express the covenantor's intention that the covenants run with the land; (iii) the deeds must grant mutual easements sufficient to satisfy the requirement that the parties be in privity of estate[13]; (iv) both the benefit and the

---

[12]There remained for determination, upon further proceedings, Well-Built's claims that only one of the lots derived from Lot 5 is entitled to use of the easements over Liberty Tree Drive (Clark's Cove Drive on the Woods plan) as well as Richard's several claims for damages in the Superior Court litigation.

[13]The requirement of privity applies only to covenants running at law and

burden of a real covenant must "touch and concern" the affected parcels of land. See *Whitinsville Plaza, Inc.* v. *Kotseas*, 378 Mass. 85, 90 (1979); G. L. c. 184, § 27.[14]

Chiefly at issue here is whether the Shusters intended the benefit to run with Barbara's land. See *Whitinsville Plaza, Inc.* v. *Kotseas, supra* at 90; 9 Powell on Real Property § 60.01[2], at 60-5; § 60.04[3], at 60-42, 60-48 to 60-50 (Rohan ed. 2000). See also, e.g., *Snow* v. *VanDam*, 291 Mass. 477, 480 (1935). We find unpersuasive Richard's arguments that privity was lacking and that the burden and benefit of the covenant did not touch and concern the land.[15,16]

---

not equitable servitudes. Even if the highly criticized distinction between the two — and the corresponding privity requirement — is maintained, see note 15, *infra*, it is still possible that the restrictions would be enforceable in equity in the absence of privity. As seen in *Whitinsville Plaza, Inc.* v. *Kotseas*, 378 Mass. 85, 90 (1979), the substitute requirement for equitable servitudes is that the party against whom enforcement is sought must have notice of the relevant restrictions.

[14]In relevant part, G. L. c. 184, § 27, provides:

> "No restriction imposed after December thirty-first, nineteen hundred and sixty-one shall be enforceable: (a) unless the person seeking enforcement (1) is a party to the instrument imposing the restriction and it is stated to be for his benefit or is entitled to such benefit as a successor to such party, or (2) is an owner of an interest in benefited land which either adjoins the subject parcel at the time enforcement is sought or is described in the instrument imposing the restriction and is stated therein to be benefited . . . ."

[15]It appears that the anomalous and "peculiar" doctrine often known as "Massachusetts privity" has never been expressly overruled and may continue to attach. See *Whitinsville Plaza Inc.* v. *Kotseas*, 378 Mass. at 90, 93; 9 Powell on Real Property § 60.04[3][c][ii]. Such privity of estate exists when the covenanting parties hold simultaneous interests in the same land — that is, when they are lessor and lessee or the dominant and servient owners of an easement. *Morse* v. *Aldrich*, 19 Pick. 449, 453-454 (1837). *Hurd* v. *Curtis*, 19 Pick. 459, 464 (1837). See e.g., *Bronson* v. *Coffin*, 108 Mass. 175 (1871); *Norcross* v. *James*, 140 Mass 188, 191 (1885). Under these and like precedents, a covenant must support or be related to a property interest, in the nature of an easement, in land that the grantor of the easement retains. Despite the apparent liberalization of "Massachusetts privity" (in particular, through a loose definition of the term "easement," see Powell, *supra*), here the requirement is satisfied in even its strictest ancient form. Richard's agreement to accept common restrictions on Lots 5 and 20 may be seen as the quid pro quo for easements Barbara granted to him over her eighteen lots comprising the revised subdivision. See *Lincoln* v. *Burrage*, 177 Mass. 378, 380 (1901).

[16]From language in the separation agreement and deeds, it appears that this

This case is similar to other precedents where instruments might have been drafted with greater precision but where particular covenants nonetheless were deemed to run with the land. See, e.g., *Snow* v. *VanDam*, 291 Mass. at 481, and cases cited ("In the absence of express statement, an intention that a restriction upon one lot shall be appurtenant to a neighboring lot is sometimes inferred from the relation of the lots to each other"); *Baker* v. *Seneca*, 329 Mass. 736, 739 (1953); *Lipton Professional Soccer, Inc.* v. *Bay State Harness & Horse Racing & Breeding Assn.*, 8 Mass. App. Ct. 458 (1979); *Atwood* v. *Walter*, 47 Mass. App. Ct. 508, 512 (1999). See also Restatement (Third) of Property (Servitudes) §§ 2.2, 4.6 (2000); 9 Powell on Real Property § 60.04[3][b], at 60-54 to 60-55 (Rohan ed. 2000) (identifying factors courts rely upon to find devolution of the benefit in the absence of an express statement). Compare *Lowell Inst. for Sav.* v. *Lowell*, 153 Mass. 530 (1891); *Clapp* v. *Wilder*, 176 Mass. 332, 337-341 (1900); *Bessey* v. *Ollman*, 242 Mass. 89 (1922); *St. Botolph Club, Inc.* v. *Brookline Trust Co.*, 292 Mass. 430 (1935); *Harrington* v. *Anderson*, 316 Mass. 187 (1944).

This case, however, does not follow the familiar pattern by which restrictions imposed pursuant to a common scheme are found to run with the land. See *Snow* v. *VanDam*, 291 Mass. at 481 (observing that "in many cases there has been a scheme or plan for restricting the lots in a tract undergoing development to obtain substantial uniformity in building and use. The existence of such a building scheme has often been relied on to show an intention that the restrictions imposed upon the several lots shall be appurtenant to every other lot in the tract included in the scheme"). The relevant question here is whether the Shusters' covenant, not itself part of any common scheme of restrictions, runs with the land.

It is Well-Built's burden to establish the Shusters' intent and,

covenant was meant to bring Richard's land within a future uniform set of restrictions on development and usage of lots within the tract, and to retain the union between his lots and the greater development for such purposes. The covenant assures "the orderly and mutually beneficial development of the entire area" and is "directed at planning goals which directly affect the actual physical enjoyment of the[] property." *Gulf Oil Corp.* v. *Fall River Hous. Authy.*, 364 Mass. 492, 500 (1974) (where covenant against competition touched and concerned land). Thus, both the benefit and burden of the right to impose restrictions touch and concern the land.

although genuine ambiguities are to be resolved in favor of freedom of the land from servitude, see, e.g., *Stop & Shop Supermarket Co.* v. *Urstadt Biddle Properties, Inc.*, 433 Mass. 285, 290 (2001) and cases cited, no particular form of words is required and an omitted term of art effecting the parties' clear purpose may be inferred. See, e.g., *Lowell Inst. for Sav.* v. *Lowell*, 153 Mass. at 533; *Lipton Professional Soccer, Inc.* v. *Bay State Harness & Horse Breeding Assn.*, 8 Mass. App. Ct. at 462-463, quoting *Dittemore* v. *Dickey*, 249 Mass. 95, 104-105 (1924). See also Restatement (Third) of Property (Servitudes) § 2.2. Stated otherwise, where the parties' intent is readily ascertained, the general policy in favor of free alienation does not require us to elevate form over substance.

In discerning the Shusters' intent, we start with the terms of the grant — here set forth in the divorce judgment incorporating the Shusters' separation agreement, and later restated in the deeds — viewed in light of the circumstances attending the creation of the covenant. See, e.g., *Clapp* v. *Wilder*, 176 Mass. at 338; *Queler* v. *Skowron*, 438 Mass. 304, 311 (2002); *Lipton Professional Soccer, Inc.* v. *Bay State Harness & Horse Breeding Assn.*, *supra*; *Sheftel* v. *Lebel*, 44 Mass. App. Ct. 175, 179 (1998).

As dictated in the separation agreement, the deed conveying Lots 5 and 20 granted to Richard and his heirs and assigns utility easements and easements to use a street shown on the Liberty Tree plan as Liberty Tree Drive, see note 12, *supra*, and further recites:

> "the Grantee acknowledges that there will be restrictions and obligations imposed upon all of the lots in the Subdivision (except Parcel A as shown on the Plan), and the Grantee for himself and his successors and assigns agrees that any and all obligations and restrictions imposed upon all of the lots of the Subdivision (except Parcel A as shown on the Plan) provided the same are consistently applied in a nondiscriminatory manner, shall also be imposed upon Lots 5 and 20 at such time as these obligations and restrictions are imposed upon all of the other lots in the Subdivision (except Parcel A as shown on the Plan)."

The deed to Barbara contains the following language:

"meaning and intending to convey all right, title and interest in the land heretofore owned by the Grantors other than those parcels previously conveyed to Richard A. Shuster by deed of even date and record [*sic*] herewith, and all appurtenant rights of record, including, without limitation, those rights and easements reserved in the deed to Richard A. Shuster and record [*sic*] herewith."

Each of the deeds from the Shusters to Richard and to Barbara states that "[t]his conveyance is subject to and with the benefit of all encumbrances, restrictions and easements of record to the extent the same are in force and effect." In context, it is apparent that this reference to "encumbrances, restrictions and easements of record" also encompasses the covenant permitting imposition of certain restrictions on Richard's land if also imposed on Barbara's: the covenant was recited in the deed to Richard; it was made at the time of the divorce soon after the Shusters had created the Liberty Tree subdivision; and their separation agreement and divorce judgment were then recorded in the registry of deeds.

The deed to Barbara contains a more specific reference regarding whether the benefit of the covenant would run with Barbara's land. It specifies that the Shusters are conveying "all *appurtenant* rights of record, including, without limitation, those rights and easements reserved in the deed to Richard A. Shuster" (emphasis added). In standard law, upon which the drafters apparently relied, the term "appurtenant" commonly signals that a benefit or burden attaches to and runs with land. See, e.g., *Snow* v. *VanDam*, 291 Mass. at 480; *Lipton Professional Soccer, Inc.* v. *Bay State Harness & Horse Breeding Assn.*, 8 Mass. App. Ct. at 468. See also *Stop & Shop Supermarket Co.* v. *Urstadt Biddle Properties, Inc.*, 433 Mass. at 290.[17] The provision appears to identify the rights and easements described in Richard's deed — namely, the easements over Liberty Tree Drive and the ability to subject Liberty Tree plan Lots 5 and 20 to common restrictions — as "appurtenant"

_____

[17]But cf. Restatement (Third) of Property (Servitudes) § 1.5 & comment a; § 2.2, comment i; § 4.6(2) & comment d (where specified, a benefit or burden may be both appurtenant to land and personal to a particular owner).

to Barbara's land. Moreover, the repetition of the cited language in Barbara's deed to Well-Built[18] conveys at least her understanding that the benefit was not personal to her. Cf. *Harrington* v. *Anderson*, 316 Mass. at 190.

The motion judge, though, relied heavily on the fact that the deeds did not explicitly contain an affirmative "right" to impose conditions on Lots 5 and 20. To run with the land, the judge emphasized, a covenant must be in writing and signed by the covenantor. *Whitinsville Plaza, Inc.* v. *Kotseas*, 378 Mass. at 90. However, the covenant is typical in that it defines the obligations or restrictions assumed by Richard and that pledge is contained in an appropriate instrument — the separation agreement/divorce judgment and deed signed by both Shusters. Any parties retaining common ownership over the remaining Liberty Tree lots would necessarily have the right to create a "common scheme" of restrictions for them, and Richard firmly avowed that any such plan would also apply to his land.

Although it may have been preferable to declare that the benefit of the particular covenant in question would run with Barbara's estate, see 9 Powell on Real Property § 60.04[3][b], at 60-51 to 60-52, such statement, as we have stressed, is not required. The circumstances of the creation of the covenant and the context of the transactions strongly suggest that the Shusters meant for the benefit to run with the land and that Richard got exactly what he bargained for. The deeds and the separation agreement, viewed in light of the circumstances in which they were created, reveal that the Shusters' objective from the outset was to subject the entire development to a common set of restrictions either before or after Richard took title. Richard's lots, contiguous to the remaining lots and designed as part of a whole complex, would benefit from the placement of restric-

---

[18]Barbara's deed to Well-Built contains language similar to that in the deed to her:

> "meaning and intending to convey all right, title and interest in the land heretofore owned by the Grantors . . . and all appurtenant rights of record, including[,] without limitation, those rights and easements reserved in the deed to Richard A. Shuster dated August 5, 1999 . . . . This conveyance is subject to and with the benefit of all encumbrances, restrictions and easements of record to the extent the same are in force and effect."

tions upon his neighbors as well as from easements over the subdivision roadway.[19] He was protected from overly burdensome restrictions by the fact that the covenant strictly limited his liability to obligations applied to all of the lots in a consistent and nondiscriminatory fashion, as well as by the underlying concept of a uniform development. It could fairly be expected that the developer of the subdivision would create only those restrictions likely to increase the resale value of the remaining lots.[20] See 9 Powell on Real Property § 60.05, at 60-77 to 60-78 (plans for subdivisions are increasingly understood to "act as private zoning schemes, generally tending to maintain and enhance the value and alienability of the property involved"); Restatement (Third) of Property (Servitudes) § 2.14 comment a. Moreover, the Shusters placed conditions on the scope of the restrictions that could be imposed; also, under general and statutory law, particular conditions might be declared invalid or otherwise unenforceable.

Also inherent in the deeds is the Shusters' intent that any "common scheme" executed for the development would have necessarily run with both Barbara's and Richard's land and would have been enforceable against Richard by the successive lot owners. E.g., *Gulf Oil Corp.* v. *Fall River Hous. Authy.*, 364 Mass. at 497-499; *Guillette* v. *Daly Dry Wall, Inc.*, 367 Mass. 355, 358 (1975), and cases cited. Cf. *Ward* v. *Prudential Ins. Co.*, 299 Mass. 559, 563-564 (1938) (where one grantor created common restrictions for a tract, while a second grantor divided that tract into lots, the plan of restrictions nevertheless applied

---

[19]Richard's ANR plan for subdividing his lots, submitted in 2001, contains the title "The Woods at Padanaram Village," and on that ANR plan he numbered the new lots (derived from Lot 5) 16 and 16A, making the numbering consecutive to the Woods lots, which end at Lot 15. This at least suggests that Richard viewed Lots 5 and 20 as part of the over-all subdivision.

[20]The Shusters could not, when creating their separation agreement and the deeds, have intended merely that Well-Built could dictate that Barbara create the restrictions prior to the conveyance, as it did with other changes in the subdivision. Especially in light of the Shusters' overall purpose (to create a uniform development containing Richard's land), it would mean little in substance to declare that the covenant could not run with the land. We are disinclined to construe an instrument to lead to a meaningless result. See, e.g., *Maddalena* v. *Brand*, 7 Mass. App. Ct. 466, 469 (1979); *Lipton Professional Soccer, Inc.* v. *Bay State Harness & Horse Breeding Assn.*, 8 Mass. App. Ct. at 463, 466, 467.

to each of the lots). Thus, in our opinion, the Shusters' covenant is properly understood as a typical example of a covenant running with the land.

Both Richard and the motion judge have posited several particulars as to why this restriction does not so conform. We address these in sequence. First, Richard asserts that he agreed only to subject his parcel to restrictions placed on the 1988 Liberty Tree plan and not on the revised Woods plan. This contention is wholly impractical. All of the land on the original plan (the dominant estate) is part of the Woods plan with only a tiny portion (the DeMello lot) added. That minor change, along with the redrawing of a few lots (which Barbara could have done herself), cannot prevent the benefit from running. The Woods plan, plus Richard's lots, was essentially the same tract the parties sought to subject to a common scheme, and their purpose would be defeated by tying the covenant to specifications frozen in 1988.[21] Richard could not have realistically expected the original subdivision plan to remain inviolate after taking title; nor was he restricted from making alterations in the configuration of his lots prior to imposition of the restrictions on all of the lots in the tract.

Second, Richard also claims that Well-Built did not initially intend to include Richard's lots in the Declaration. This assertion is not significant. Richard specified that his lots would be subject to restrictions at the same time they were imposed on the remaining lots in the subdivision. Those restrictions were intended by the Shusters to be applicable to Richard's lots and immediately transferred to his land upon their creation.

Third, Richard postulates that covenants evincing one's submission to future restrictions that lack specific present content can never run with the land but are always personal to the original covenanting parties. No authority for this view is presented (covenants to perform a future act — here, to subject his land to developmental bylaws — are standard fare, see, e.g., 9 Powell on Real Property § 60.01[1], at 60-4, § 60.06[1], at 60-87). Indeed, the "indefinite reference" statute, G. L. c. 184,

---

[21]The covenant was, as we have noted, restated in the August, 1999, deeds, contemporaneously with the approval of the new subdivision.

§ 25,[22] states only that an "indefinite reference" in a deed does not apply adversely to those who are not immediate parties to the deed or on notice of it.

Finally, Richard suggests that when creating the covenant he expected to have a future role in the crafting of a common scheme. This is nowhere indicated in the documents and is belied by the circumstances. As recognized by the motion judge, Richard's bare statements of his intent at the time are irrelevant.

b. We turn now to a remaining issue, not addressed by the Land Court judge. Although the documents, viewed in light of the attendant circumstances in which they were created, manifest the Shusters' intent that the right to impose restrictions was not personal to Barbara, they do not clearly manifest the Shusters' intent as to the nature and extent of the possible restrictions to be created. Well-Built asserts that any and all restrictions created by it, so long as applicable to all lots in the Woods subdivision, would be also applicable to Richard's lots. Richard maintains that such restrictions as could be imposed were only those "standard subdivision restrictions" relating to the "quality and style of homes within the subdivision," and not a restriction precluding further subdivision. Neither of the parties have argued the point, and we cannot assume that the record before us includes all of the evidence that might be brought to bear on the issue.

"The inquiry in this respect is to ascertain the intention of the parties in executing and accepting the [documents of conveyance]. That intention is to be found in the words used interpreted in the light of all the material circumstances and the pertinent facts known to the parties." *Allen* v. *Massachusetts Bonding & Ins. Co.*, 248 Mass. 378, 383 (1924). *Myers* v. *Salin*, 13 Mass. App. Ct. 127, 142 (1982). A restrictive covenant must, however, "be strictly interpreted in favor of limiting the restraint

---

[22]An indefinite reference includes:

"(1) a recital indicating . . . that real estate may be subject to restrictions . . . not created by instruments recorded in due course, . . . and (4) any other reference to any interest in real estate, unless the instrument containing the reference either creates the interest referred to or specifies a recorded instrument by which the interest is created . . . ."

G. L. c. 184, § 25.

on use of the granted premises." *Brennan* v. *Kos*, 15 Mass. App. Ct. 513, 514 (1983), quoting from *Donoghue* v. *Prynnwood Corp.*, 356 Mass. 703, 707 (1970).

In this connection, we make some general observations about the documents in the record, and point to matters that might be considered by the Land Court judge. The terms of the separation agreement — in which, as we have indicated, the covenant was first created — provided for two limitations as to the nature and scope of the restrictions to be imposed.

First, these restrictions were to be "consistently applied in a non-discriminatory manner to all of the buildable lots in the subdivision," suggesting not only that all restrictions were to be applied neutrally to each of the lots, but also that the restrictions themselves would be substantially consistent in effect. On remand, the trial judge will be called upon to address the meaning and application of this condition in Richard's deed.

Second, as specified in the separation agreement, "[i]t is understood and agreed that the restrictions and obligations that will be imposed on the Liberty Tree Subdivision shall apply to Lot 20 only to the extent that structures are added to the property or existing structures are rebuilt and expanded." This condition is ambiguous in that it could be interpreted to mean either that the Shusters intended future restrictions to be only those applicable to structures, or that any restrictions could be imposed that were neutrally and consistently applied, but would not be applicable to structures existing on Lot 20.[23] The trial judge must review the facts and circumstances surrounding the creation of the documents at issue and resolve any ambiguities contained in this language.

In resolving any ambiguity, the facts and circumstances to be

---

[23]In terms that do not precisely track the language of the separation agreement, the deed sets out the following exception from the restrictions to be imposed: "It is agreed and understood that to the extent that the restrictions and obligations apply to structures located on the lots in the Subdivision, such restrictions and obligations shall only apply to Lot 20 to the extent new structures are added or existing structures are rebuilt or expanded." That the deeds do not strictly track the language of the separation agreement, and might lead to a different interpretation, is also a matter for the Land Court judge to consider in light of the circumstances surrounding the creation of the covenant.

taken into account include that Lot 20, at 227,091 square feet, is considerably larger than the largest of the lots on the original Liberty Tree plan (and in the final Woods subdivision).[24] Also to be considered is whether house lots immediately surrounding the development were the same or smaller in size when the covenant was created; the types of homes built on these lots at the time; and whether the landscape naturally lends itself to a separation or distinction between the development and the surrounding lots, such that it would make sense to impose a minimum lot size restriction for the subdivision and thereby enhance or preserve the value of the lots. See, e.g., *Reagan* v. *Brissey*, 64 Mass. App. Ct. 154, 161-162 (2005) (considering advertisements at the time, as well contemporaneous legal opinions, regarding promotion of the area as a vacation community, to ascertain intent as to creation of easements). Consideration of facts known to the Shusters at the time they entered into the separation agreement is needed to support any inferences regarding whether the Shusters intended that future restrictions might also include a restriction on further subdivision of Richard's lot, or would be limited to certain aesthetic and architectural controls. But, "if language remains ambiguous, doubts are to be resolved in favor of freedom of the land from servitude." *Boston & Maine R.R.* v. *Construction Mach. Corp.*, 346 Mass. 513, 518 (1963).

Finally, even if the restriction against subdivision is found to be applicable to Richard's lots, the judge must then consider whether Well-Built may enforce it. In this connection, it will be incumbent upon Well-Built to establish, under G. L. c. 184, § 30,[25] that it derives an "actual and substantial benefit" from the restriction, which cannot consist solely of the "hold-up

[24]Facially, Well-Built seeks to impose a lot size restriction on Richard's lots that is inconsistent by a considerable factor with the lot sizes in the final Woods subdivision, most of which are in the 30,000 to 40,000 square foot range, with the largest at about 140,000 square feet. In addition, on September 7, 2001, Well-Built agreed to amend the declaration for the owners of Woods plan Lot 7, releasing the lot from architectural control and numerous design restrictions. Well-Built asserts that, in part due to the large size of Lot 7, buildings would not be visible from the rest of the subdivision and would not impact the value of the other lots.

[25]G. L. c. 184, § 30, provides, in pertinent part, as follows: "No restriction shall in any proceeding be enforced or declared to be enforceable . . . unless

price" for its release.[26] *Garland* v. *Rosenshein*, 420 Mass. 319, 321 (1995). It would be relevant in this context to determine, for example, whether Well-Built sold all or some of the buildable lots in the Woods tract without the belief that Lot 5 and 20 were part of the development. Even if a party is able to demonstrate such a benefit, equitable remedies are nonetheless prohibited by the statute in the enumerated situations.[27] G. L. c. 184, § 30. See also, e.g., *Blakely* v. *Gorin*, 365 Mass. 590, 604-606 (1974); *Atwood* v. *Walter*, 47 Mass. App. Ct. at 515-518.

4. *Conclusion.* The judgment is vacated. The case is remanded to the Land Court for proceedings consistent with this opinion.

*So ordered.*

it is determined that the restriction is at the time of the proceeding of actual and substantial benefit to a person claiming rights of enforcement."

[26]Richard alleged in his Land Court answer and counterclaim as well as in his Superior Court complaint that despite the mutual releases, Well-Built informed Richard's purchaser, Harris, that the restrictions applied to the reconfigured Lot 20 and demanded payment from Richard to approve the subdivision and sale of that lot. Richard further alleged that the sale to Harris fell through as a result of Well-Built's demands.

[27]"No restriction determined to be of such benefit shall be enforced or declared to be enforceable, except in appropriate cases by award of money damages, if (1) changes in the character of the properties affected or their neighborhood, in available construction materials or techniques, in access, services or facilities, in applicable public controls of land use or construction, or in any other conditions or circumstances, reduce materially the need for the restriction or the likelihood of the restriction accomplishing its original purposes or render it obsolete or inequitable to enforce except by award of money damages, or (2) conduct of persons from time to time entitled to enforce the restriction has rendered it inequitable to enforce except by award of money damages, or (3) in case of a common scheme the land of the person claiming rights of enforcement is for any reason no longer subject to the restriction or the parcel against which rights of enforcement are claimed is not in a group of parcels still subject to the restriction and appropriate for accomplishment of its purposes, or (4) continuation of the restriction on the parcel against which enforcement is claimed or on parcels remaining in a common scheme with it or subject to like restrictions would impede reasonable use of land for purposes for which it is most suitable, and would tend to impair the growth of the neighborhood or municipality in a manner inconsistent with the public interest or to contribute to deterioration of properties or to result in decadent or substandard areas or blighted open areas, or (5) enforcement, except by award of money damages, is for any other reason inequitable or not in the public interest."

G. L. c. 184, § 30.