JOHN P. SULLIVAN & another[1] *vs.* ELIZABETH O'CONNOR
& others,[2] trustees.[3]

No. 10-P-1590.

Suffolk. October 6, 2011. - January 27, 2012.

Present: GRAINGER, FECTEAU, & AGNES, JJ.

*Real Property,* Restrictions, Equitable restriction. *Contract,* Implied.

In a civil action brought in the Land Court by plaintiff homeowners within a
    homeowners' community (community), seeking a judgment declaring that
    they were not required to pay a semiannual assessment levied by the
    trustees of the homeowners' association (association) created to provide
    services and amenities to the community, the judge properly granted sum-
    mary judgment in favor of the trustees, where, although the plaintiffs' deed
    did not contain an explicit provision requiring membership in the associa-
    tion or the payment of the association's assessments, there was ample
    evidence that the plaintiffs' deed specifically referenced the association
    multiple times in connection with restrictive covenants, and the plaintiffs
    had actual knowledge of the obligation to pay assessments to the associa-
    tion [205-207]; where the record contained sufficient evidence that a com-
    mon scheme had been created at the inception of the community and
    continued to exist at the time of the plaintiffs' purchase of their property
    [207-212]; and where such assessments were enforceable against the
    plaintiffs under an implied-in-fact contract theory [212-213].
In a civil action brought in the Land Court by plaintiff homeowners within a
    homeowners' community (community), seeking a judgment declaring that
    they were not required to pay a semiannual assessment levied by the
    trustees of the homeowners' association (association) created to provide
    services and amenities to the community, the judge properly granted sum-
    mary judgment in favor of the trustees, where, although the restrictions in
    the plaintiffs' deed had been extinguished by operation of G. L. c. 184,
    § 28, the obligation to pay the assessments were an equitable servitude
    that had not expired [213-214]; however, because such an equitable servitude
    could not be enforced through an action in personam, this court modified
    the judgment to declare that payment of the assessments to the association
    could only be charged against the plaintiffs' property and not as their
    personal obligation [214-215].

[1]Pamela A. Sullivan.

[2]Heather Maykel, Janet A. Birbara, Stephen Granger, and Steven J. Gordon.

[3]Of the Westwood Hills Improvement Association.

CIVIL ACTION commenced in the Land Court Department on October 25, 2007.

The case was heard by *Charles W. Trombly, Jr.,* J., on motions for summary judgment.

*Donald J. O'Neil* for the plaintiffs.

*Stephen J. Gordon* for the defendants.

FECTEAU, J. John P. Sullivan and Pamela A. Sullivan (collectively, Sullivans), plaintiffs in an action for declaratory judgment in the Land Court, appeal from the allowance of the motion for summary judgment made by the defendants, the trustees (defendant trustees or trustees) of the Westwood Hills Improvement Association (association). The Sullivans, who own a home within the community of the association, sought a judgment declaring that they are not required to pay semiannual assessments to the association. The Sullivans contend that the judge erred in deciding that the association could enforce its assessments against the Sullivans as an equitable servitude that burdened their land. Additionally, the Sullivans aver the judge erred in failing to issue the requested declaration that the deed restrictions, consistent with covenants of a 1929 declaration of trust, have expired by operation of G. L. c. 184, § 28, and thus that the Sullivans' property is not bound by a 1991 "declaration of restrictive covenants."[4] With a modification and an amendment, in large part we affirm.

*Background.* The association is an unincorporated association created by a declaration of trust recorded in 1929. The association holds various properties in Westwood Hills, known collectively as the Westwood Hills Community (community). The association was created to provide services and amenities to the community, including common ownership and creation of roadways, parks, trees, and playgrounds; their maintenance by snow removal and landscaping services; and general community maintenance. The association also pays taxes, assessments, and liens that have been levied on property held by the association. Pur-

---

[4]The Sullivans also complain that the judge improperly struck paragraph 6 of John P. Sullivan's affidavit, in which he purported to attach various uncertified and improperly authenticated documents. We are unpersuaded, given the reasoning of the judge, that this error, if any, has relevance to the principal issues on appeal.

suant to the language of the declaration of trust, the trustees of the association shall issue certificates to property owners in the community, and whenever such property is sold, the former owner must transfer that certificate to the new owner.[5]

1. *Sullivans' deed.* In 1977, the Sullivans purchased property within the community at 14 Surrey Lane (the property). Their deed made a specific title reference to a 1947 deed from the Westwood Hills, Inc., to the association.[6] This 1947 deed, in

---

[5]The obligation of property owners, as certificate holders, to pay assessments appears only in the 1929 declaration of trust. Specifically, the declaration states:

> "Article IX. . . . Each certificate holder shall pay to the Trustees . . . the amount of the annual charge or assessment determined as hereinafter provided. . . .

> "Article X. . . . Certificate holders shall have no legal title to the trust property, real or personal, held from time to time by the Trustees and shall have no right to call for any partition. Their interest consists only in the right to receive benefits from the public or semi-public or community property together with others. Said certificates are personal property and are transmissible and transferable as personal property on the books of the Trustees subject to the provisions of this agreement. The sale of a certificate holder's land terminates his interest in the trust and his right passes to his successor in title.

> "Certificates may be transferred on the books of the Trustees by the person named in the certificate thereof . . . upon the surrender of the certificate duly endorsed and a new certificate shall be issued to the transferee subject, however, to the provision herein contained that no certificates shall be transferred except to an owner of a lot shown on said plan of Westwood Hills.

> "Each person upon receiving a certificate shall assent to a written copy of this trust and agree to be bound by the provisions of the same and to the payment of assessments as herein provided.

> "In case of the sale by any certificate holder of his lot he shall transfer to the new owner his certificate, who shall accept the obligation thereunder by an instrument in writing duly recorded on the books of the Trustees. Assessments shall be binding upon the certificate holders in case of sale unless and until his certificate shall be duly transferred as aforesaid to the succeeding owner of said lot."

[6]In 1948, trustees of the association deeded the property ultimately acquired by the Sullivans to "Harry B. Goodspeed, et ux"; thereafter, the property was conveyed to the Joneses; and subsequently, in 1967, the Joneses conveyed title to the Melvilles. The Melvilles conveyed title to the Sullivans in 1977.

turn, made a specific title reference to the 1929 declaration of trust that created the association and in which the duty to pay assessments appears.

The language of the deeds in the Sullivans' chain of title expressly subjects said property to "any and all restrictions of record which are now in force and applicable thereto," which are imposed for the benefit of the association and the property owners. The Sullivans' deed specifically recites that the premises are conveyed, along with "all the privileges and appurtenances thereto belonging, . . . [t]ogether with all right, title, and interest of the grantor in the abutting portion of Surrey Lane to the center line thereof, subject to the use thereof by others having rights therein." The Sullivans, moreover, purchased said property subject to restrictions for "the benefit of all the owners of land in Westwood Hills," restrictions that "shall be enforceable by the Trustees of the Westwood Hills Improvement Association; or by any or all owners of lots of land in said Westwood Hills," and "are to remain in force until the expiration of one hundred and fifty years from January 1, 1930," unless otherwise released, as mentioned in a recorded declaration of trust, "by a two-thirds vote of the holders of certificates" in the association.

Among the various restrictions imposed upon the property, the Sullivans' deed sets forth restrictions on setbacks, subdivisions, and new construction, and a prohibition on commercial use. The restrictions further curb appropriate uses of the property, reserving to the association the right to approve or disapprove certain uses. However, the Sullivans' deed does not contain any language that expressly requires membership in, or payment of assessments to, the association. As such, the Sullivans claim never to have received a certificate from the association or from the Melvilles, from whom they purchased the property, obligating payment of assessments to the association, and that they (the Sullivans) never agreed to be members of or bound to the association.[7]

From their purchase in July, 1977, through June, 1983, the Sullivans received notice of, and paid, semiannual assessments

[7]This certificate is not a certificate of title under G. L. c. 185 (registered land), but instead the certificate referred to in the 1929 declaration of trust that describes the restrictions, obligations, and benefits that come with being an association member.

from the association. After June, 1983, the Sullivans ceased all payments and thereafter on several occasions requested the association set forth a sufficient basis upon which it could enforce said assessments against the Sullivans.[8] The association responded by sending letters from various trustees explaining the association's understanding of the 1929 trust declaration and enclosing a copy of it. In 1991, the association filed and recorded a "declaration of restrictive covenants," which was signed by every property owner in the community with the exception of the Sullivans.

2. *Procedural history.* In 2007, the trustees brought suit against the Sullivans in District Court seeking their unpaid assessments (from and after June, 1983). The Sullivans responded by obtaining a stay of the District Court action in order to file the present action in the Land Court for declaratory and injunctive relief.

*Discussion.* We review the motion record according to the familiar summary judgment standard. Summary judgment is appropriate if, "viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991), citing Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). "[A] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates . . . that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case. To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party's claim." *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

An appeal based on a summary judgment motion is subject to de novo review by this court. *Fortenbacher* v. *Commonwealth*, 72 Mass. App. Ct. 82, 85 (2008). "The principles governing interpretation of a deed are similar to those governing contract interpretation." *Estes* v. *DeMello*, 61 Mass. App. Ct. 638, 642 (2004). Interpretation of a contract or an agreement is a question

[8]The parties dispute two payments alleged to have been made by the Sullivans in 2001, in the amounts of $3,375.70 and $348.27.

of law. *Lumber Mut. Ins. Co.* v. *Zoltek Corp.*, 419 Mass. 704, 707 (1995). When interpreting a contract, the judge must look at the contract as a whole. See *Starr* v. *Fordham*, 420 Mass. 178, 190 (1995), quoting from *Commissioner of Corps. & Taxn.* v. *Chilton Club*, 318 Mass. 285, 288 (1945) ("the scope of a party's obligations cannot 'be delineated by isolating words and interpreting them as though they stood alone' "). Similarly, "[t]he interpretation of a written trust is a matter of law to be resolved by the court. . . . A trust should be construed 'to give effect to the intention of the settlor as ascertained from the language of the whole instrument considered in the light of the attendant circumstances.' " *Schroeder* v. *Danielson*, 37 Mass. App. Ct. 450, 453 (1994), quoting from *Harrison* v. *Marcus*, 396 Mass. 424, 429 (1985).

1. *Mandatory nature of assessments.* In allowing the trustees' motion for summary judgment, the judge determined the Sullivans were required to pay the association's assessments based on three distinct theories: title-based; common scheme; and implied-in-fact contract. The judge's decision finds ample support in the motion record on all three bases, any one of which provides a sufficient basis to affirm the judge's decision.

a. *Title-based theory.* While Massachusetts follows the general rule that land "is free of encumbrances that are not noted on the certificate of title" or in the chain of title, there exist two exceptions to that general rule: "(1) an encumbrance may bind an owner if what the certificate of title recites in the way of prior documents, plans, restrictions, rights, and reservations would prompt a reasonable purchaser to investigate further the referenced documents, or (2) the purchaser has actual knowledge of the encumbrance." *Popponesset Beach Assn.* v. *Marchillo*, 39 Mass. App. Ct. 586, 588 (1996) (citations omitted). See G. L. c. 185, § 46. Where a grantee takes title to land without either express mention of restrictions on said land in the grantee's deed or knowledge of such restrictions, the grantee still may be bound by said restrictions. See *Guillette* v. *Daly Dry Wall, Inc.*, 367 Mass. 355, 357-358 (1975). In circumstances where the restrictions appeared in the deeds of all remaining property owners, and where the deed at issue refers to the existence of the subdivision plan,

"a purchaser of part of the restricted land . . . therefore took subject to the restrictions." *Id.* at 359.[9]

In his application of the title-based theory, the judge appropriately acknowledged the Sullivans' contention that the 1977 deed did not contain an explicit provision requiring membership in the association or the payment of the association's assessments. Nevertheless, we agree with the judge that the instant case falls within both exceptions set forth in *Popponesset Beach Assn., supra,* and further explained by *Guillette.*

Turning to the first exception, the judge properly cited the existence of "ample evidence" that the Sullivans' deed specifically referenced the association multiple times in connection with the restrictive covenants. The chain of title to the Sullivans' property charged the Sullivans with notice that their property was subject to restrictions and obligations of the type claimed by the association, thereby providing sufficient notice to stimulate a search for obligations imposed by the association, which would have led to the 1929 declaration of trust. Moreover, we consider it significant that the trust declaration specifies that "[t]he sale of a certificate holder's land terminates his interest in the trust and his right [to receive benefits from the public or semipublic or community property together with others] passes to his successor in title." See note 5, *supra.* The fact that the Sullivans may not have acquired a certificate from their predecessor in title is irrelevant, as it is clear that property ownership is the sine qua non of beneficial interest in the trust and, by virtue thereof, of its burdens.

Shifting our analysis to the second exception to the general rule that encumbrances will not be imposed on otherwise free land, we find also that the Sullivans had actual knowledge of the obligation to pay assessments to the association. In light of

---

[9]*Guillette* thus may be viewed as an application of the first exception set forth in *Popponesset Beach Assn., supra.* While it does not alter the settled rule that "[a] buyer of real estate cannot be charged with constructive notice of an equitable restriction unless he can find it recorded somewhere in his chain of title," *Stewart* v. *Alpert,* 262 Mass. 34, 38 (1928), cited in *Guillette, supra* at 359, we refer to *Guillette* to illustrate the principle that a landowner ultimately will be subject to a particular restriction that may not explicitly be laid out in the deed, where the deed expressly references other, related restrictions.

the obvious nature of the private services and amenities, the substantial duration in which the Sullivans received the benefit of such services, and the explicit reference to other restrictions imposed for the benefit of the community and regulated by the association, the Sullivans obtained sufficient knowledge of the duty to pay assessments to the association, which they paid for six years.

The instant case is furthermore controlled by *Guillette*. The court in *Guillette*, 367 Mass. at 358-359, cited both the existence of a uniform monetary obligation in all the deeds in the subdivision as well as the fact that the deed at issue made an explicit reference to the underlying subdivision plan as grounds upon which the court imposed said obligation. Although the facts at bar are distinguishable from those in *Guillette*, the aforementioned reasoning is applicable. Here, all past and present property owners within the community possess certificates that explicitly articulate property owners' respective duties to pay the assessments. In the same manner, the 1977 deed to the Sullivans included express conditions restricting building and use of the land and imposed a regulatory review by the defendant trustees of the association.[10] Considered in totality, the duty to pay assessments sufficiently was represented in the provenance of the Sullivans' 1977 deed.

b. *Common scheme theory.* While the Sullivans' chain of title provides ample basis for the judge's decision, insofar as there is an express declaration of trust establishing a scheme of assessments (including determination of their amounts and frequency), it also is worthwhile to examine the common scheme rationale as a basis for his decision, as this theory lends a strong independent basis to support the title-based theory and serves to overcome any technical, procedural, or superficial gap that might be perceived to lie in the mechanism provided for enforcement and collection of those assessments. Furthermore, our discussion of the common scheme theory serves as a template for

---

[10]The judge also decided that the second exception, i.e., actual knowledge, applied to the facts at bar; he was satisfied that actual knowledge existed by both the language of the 1977 deed and the supporting evidence on the record, stating: "[g]iven the private nature of the [community] and the language of the deed, it is difficult to imagine that the [Sullivans] did not have actual knowledge of the Association during the purchase of the Property."

analysis of the implied enforcement of association membership and payment of assessments.

Briefly summarized, as the judge held, because a certificate creates land restrictions by means of a writing, and every parcel of land in the community is restricted by such a certificate, "[t]o hold that [the Sullivans] are exempt from such an obligation simply because the previous owner allegedly failed to assign the certificate, or because the Association failed to keep record of a certificate, is contrary to the law and to basic principles of equity and fairness." The judge analogized the facts arising in the instant case to the traditional view of common scheme explained in *Houghton* v. *Rizzo*, 361 Mass. 635, 642 (1972), which states that "if a developer conveys enough lots on a subdivision plan by deeds including uniform restrictions which prove the existence of a uniform or common scheme for the development but without expressly agreeing to insert the same restrictions on later conveyances of other lots on the plan, an agreement to do so may nevertheless be implied and enforced in equity . . . ." Despite the court's proclivity for finding land free from servitudes, it will broadly construe the language in a deed, finding "intent to create a servitude [to be] express or implied," Restatement (Third) of Property (Servitudes) § 2.2 (2000), with "no particular form of words . . . required and an omitted term of art effecting the parties' clear purpose . . . inferred." *Well-Built Homes, Inc.* v. *Shuster*, 64 Mass. App. Ct. 619, 629 (2005). As the courts of Massachusetts have not dealt specifically with the issue of levying assessments in equity, we look to other States as well as to the Restatement for guidance.

In determining the existence of a common scheme, the judge appropriately noted the applicability of § 2.14 of the Restatement, which states: "[a] conveyance by a developer that imposes a servitude on the land conveyed to implement a general plan creates an implied reciprocal servitude burdening all the developer's remaining land included in the general plan, if injustice can be avoided only by implying the reciprocal servitude."[11],[12] Restatement (Third) of Property (Servitudes), *supra* at § 2.14.

---

[11]Section 1.7 of the Restatement further defines such a "general-plan development" as "(1) a real-estate development or neighborhood in which

An implied obligation will exist "where the declaration expressly creates an association for the purpose of managing common property or enforcing use restrictions and design controls, but fails to include a mechanism for providing the funds necessary to carry out its functions. When such an implied obligation is established, the lots are a common-interest community within the meaning of this Chapter." *Id.* at § 6.2 comment a. This implied intent to both benefit and burden the properties within the community by restricting the building and the use of said properties as well as imposing an obligation to pay assessments to the association irrespective of the transfer of certificates can be seen in the following language in the 1929 declaration of trust: "The sale of a certificate holder's land terminates his interest in the trust and his right passes to his successor in title." The fact that the Sullivans may not have received a certificate or, more fundamentally, that their deed does not recite an obligation to pay assessments, is not fatal.[13] See Restatement

individually owned lots or units are burdened by a servitude imposed to effectuate a plan of land-use controls for the benefit of the property owners in the development or neighborhood[, and] (2) [a] general-plan development is also a common-interest community if it meets the criteria set forth in § 1.8." Restatement (Third) of Property (Servitudes), *supra* at § 1.7.

[12]Section 1.8 of the Restatement states that " '[a] common-interest community' is a real-estate development or neighborhood in which individually owned lots or units are burdened by a servitude that imposes an obligation that cannot be avoided by nonuse or withdrawal (1) to pay for the use of, or contribute to the maintenance of, property held or enjoyed in common by the individual owners, or (2) to pay dues or assessments to an association that provides services or facilities to the common property or to the individually owned property, or that enforces other servitudes burdening the property in the development or neighborhood." Restatement (Third) of Property (Servitudes), *supra* at § 1.8.

[13]Indeed, the introductory sentences of comment c to § 1.8 of the Restatement are informative as to this implied duty to support the trust property and services and are descriptive of the development at issue: "Most common-interest communities have both commonly held property and mandatory-membership associations, but the existence of either is sufficient to constitute the property bound by the servitude requiring payment to a common-interest community. The distinctive feature of a common-interest community is the obligation that binds the owners of individual lots or units to contribute to the support of common property, or other facilities, or to support the activities of an association, whether or not the owner uses the common property or facilities, or agrees to join the association. Most common-interest communities are created by a declaration, which not only imposes the servitudes, but also

(Third) of Property (Servitudes), *supra* at § 6.2 comment a ("The distinctive feature of a common-interest community is the obligation that binds the owners of individual lots or units to contribute to the support of common property, or other facilities, or to support the activities of an association . . .").

Moreover, the language set forth in the Restatement is consistent with Massachusetts law, as pronounced in *Snow* v. *Van Dam*, 291 Mass. 477 (1935). In *Snow*, the Supreme Judicial Court declared, "The existence of such a building scheme has often been relied on to show an intention that the restrictions imposed upon the several lots shall be appurtenant to every other lot in the tract included in the scheme." *Id.* at 481. Consistent with this notion of an implied obligation and mutual restrictions, we conclude the Sullivans had an implied obligation to render semiannual assessments to the association.

Moreover, this conclusion is consistent with interpretations of the Restatement outside Massachusetts where courts have construed the obligation of a property owner in a common interest community to include an implied obligation to uphold the common interest of the community. The Colorado Supreme Court in *Evergreen Highlands Assn.* v. *West*, 73 P.3d 1, 8 (Colo. 2003), cert. denied, 540 U.S. 1106 (2004), observed, "[T]he newest version of the Restatement of Property (Servitudes) provides that 'a common-interest community has the power to raise the funds reasonably necessary to carry out its functions by levying assessments against the individually owned property in the community. . . .' Restatement (Third) of Property: Servitudes § 6.5(1)(a) (2000). In addition, as explained in a comment to that section, the power to levy assessments 'will be implied if not expressly granted by the declaration or by statute.' " See *Weatherby Lake Improvement Co.* v. *Sherman*, 611 S.W.2d 326, 331 (Mo. Ct. App. 1980) (lot owners required to pay assessments for upkeep of lake even though developer who created lake failed to impose maintenance obligation in deeds or create homeowners association). See also *Evergreen Highlands Assn.*, *supra* at 7

provides automatic and mandatory membership in an association of property owners. Such a provision is not a prerequisite for inclusion in the definition of a common-interest community as used in this Restatement." Restatement (Third) of Property (Servitudes), *supra* at § 1.8 comment c.

(even where status of obligation to pay assessments shifted from voluntary to mandatory, and where there was no explicit declaration in deed, association retained equitable power to collect assessments); *Sea Gate Assn.* v. *Fleischer*, 211 N.Y.S.2d 767, 778 (N.Y. Sup. Ct. 1960) ("Those who are entitled to enjoy the easements are the ones who must pay the cost of maintenance"); *Spinnler Point Colony Assn.* v. *Nash*, 689 A.2d 1026, 1028-1029 (Pa. Commw. Ct. 1997) (owners receiving appreciated benefit from services of residential developers have obligation to pay proportionate share of maintenance service and amenities).

Here, the record contains sufficient evidence that a common scheme was created in 1929 and continued to exist at the time of the Sullivans' purchase of their property. Looking to the original documents inherent in the establishment of the community in 1929, its subdivision, and the original deeds drafted by the developer, it is clear the association was created with the purpose of managing and maintaining the community. These documents appear to have been created contemporaneously with the trust and the association, as all the original deeds refer to the trust. The declaration of trust explicitly states that an association of property owners existed, that said association owned and maintained common areas within the community, and that the association had the power to impose annual membership or use fees on "certificate holders," i.e., lot owners. Such clear language demonstrates that the trust document manifested an interest created for the common benefit of those in the community to be held by the owners of property. Equally well supported by the record is the existence of a burden to be shared by those same property owners to support, by the payment of assessments, the property held in trust and the duties of maintenance of the association, again for the common benefit of the community and its property owners. Stated in the Sullivans' deed is a clear expression that the property is conveyed subject to restrictions that were "made for the benefit of all of the owners of land in Westwood Hills," and that said restrictions "shall be enforceable by the Trustees of the Westwood Hills Improvement Association; or by any or all owners of lots of land in said Westwood Hills." The widespread and common applicability of these restrictions creates a common scheme whereby obligations are

necessarily implied on all property owners. As such, the certificates
are seen as a device of convenience but not the sine qua non of
responsibility to pay the assessments. As suggested by the Restate-
ment and the cases cited, *supra*, said declarations were sufficient
to create a common interest community by implication.

c. *Implied-in-fact contract theory.* Finally, we agree with the
judge's finding that the assessments were enforceable against
the Sullivans pursuant to an implied-in-fact contract theory.

"In the absence of an express agreement, a contract implied
in fact may be found to exist from the conduct and relations of
the parties." *LiDonni, Inc.* v. *Hart*, 355 Mass. 580, 583 (1969).
"[A] contract implied in law is an obligation created by law
'for reasons of justice, without any expression of assent and
sometimes even against a clear expression of dissent . . . .
[C]onsiderations of equity and morality play a large part . . . in
constructing a quasi-contract.' "[14] *Salamon* v. *Terra*, 394 Mass.
857, 859 (1985), quoting from 1 Corbin, Contracts § 19 (1963).

The judge properly credited the argument proffered by the
defendant trustees: that the Sullivans purchased the property
with actual knowledge of the association and that, by moving
into the neighborhood with such perceptible services, they would
have been on notice that the property was part of a private
community. See *Sea Gate Assn.*, 211 N.Y.S.2d at 779 (lot owners
"became aware of the presence . . . and all other conditions in
this private community. Certainly the thought must have occurred
to them that someone must pay for the maintenance and con-
struction of those facilities"). Moreover, the Sullivans paid the
semiannual assessments for six consecutive years, and consis-
tently availed themselves of the services provided by the as-
sociation, including road repair and snow removal. There was

---

[14]While the issue of implied assessments has not been frequently litigated
in Massachusetts, the view adopted by the judge, and with which we agree, is
consistent with judicial interpretations from other jurisdictions. See, e.g.,
*Perry* v. *Bridgetown Community Assn.*, 486 So.2d 1230, 1234 (Miss. 1986)
("A landowner who wilfully purchases property subject to control of the as-
sociation and derives benefits from membership in the association implies his
consent to be charged assessments and dues common to all other members");
*Seaview Assn. of Fire Island, N.Y.* v. *Williams*, 69 N.Y.2d 987, 989 (1987)
(when lot purchaser has knowledge that homeowners association provides
facilities and services to community residents, purchase creates implied-in-fact
contract to pay proportionate share of those facilities and services).

ample evidence they "manifested acceptance of the obligation to pay for the services provided by the Association." *Ibid.* (purchase of property bound by communal obligations is acceptance of offer terms and creates implied-in-fact contract to meet obligations).

2. *Nonexpiration of assessments.* The judge agreed with the Sullivans that, as applied to them, the restrictions in the deeds had been extinguished by operation of G. L. c. 184, § 28.[15] However, contrary to the Sullivans' contention that such an expiration applied to the assessments as well, the judge distinguished the obligation to pay assessments from the deed restrictions, determining the assessments to be an equitable servitude. We agree with the judge's determination.

The requirements of an equitable servitude are: "(1) The restriction must be created in a written instrument which satisfies the Statute of Frauds. (2) The original parties must have intended that the restriction be enforceable against subsequent grantees of the land burdened with the restriction by subsequent grantees of adjoining or other parcels of land benefitted by it. (3) The restriction must 'touch and concern' the burdened and benefitted land. . . [and] (4) [a] subsequent owner of the burdened land must have had notice of the restriction[,] actual . . . [or] constructive, by virtue of the restriction being recorded in a prior conveyance in the chain of title." Alperin, Summary of Basic Law § 15.73 (4th ed. 2009). See *Whitinsville Plaza, Inc.* v. *Kotseas,* 378 Mass. 85, 90 (1979); *Well-Built Homes, Inc.,* 64 Mass. App. Ct. at 626-627 & n.13 (distinguishing equitable servitudes from real covenants).

The judge correctly noted that it is "the rule in the Commonwealth that a previous grantee's promise to make annual payments connected with land may impose on the granted premises an equitable servitude enforceable against the subsequent owner taking title with actual or constructive notice of the obligation, even where the equitable servitude calls for the payment of money," citing *Everett Factories & Terminal Corp.* v. *Oldetyme Distil. Corp.,* 300 Mass. 499, 504, 507 (1938). As

---

[15]Section 28 generally provides that restrictions imposed before 1962 are deemed to have expired fifty years from their imposition unless a new notice of restrictions is recorded every twenty years.

the judge also stated, it is indisputable that the Sullivans took title to the property with full knowledge of the existence of the association and with "constructive — if not actual — notice of their obligations to the Association," evidencing an equitable servitude that requires them "to pay the assessments as the previous owners did." That the Sullivans paid the semiannual assessments until 1983 (even after the deed restrictions arguably had expired in 1979) further confirms the Sullivans' acceptance of an equitable servitude.[16] The judge concluded that, "[i]n short, the restrictions and covenants contained in [the Sullivans'] deed have expired, but their obligations to pay their dues to the Association have not."

*Remedy.* The judge decided that the defendant trustees may seek to enforce the association's right to collect the semiannual assessments against the Sullivans. In *Everett Factories & Terminal Corp.*, *supra* at 508, a case cited by both parties, the court explained that under Massachusetts common law, an equitable servitude to pay financial obligations cannot be enforced by an action, in personam, against a defendant, but rather in an action of equity against the land. The obligation to make annual payments is enforced as an equitable servitude, and as such, enforced in equity as appurtenant rights against the premises, but said obligation "cannot, by reason of the equitable servitude, be enforced as a personal obligation of the defendant." *Ibid.* This result was consistent with a long line of cases, including *Orenberg* v. *Johnston*, 269 Mass. 312, 315 (1929), where the court differentiated between burdens that "go with the land" or are incidental to the land, and those that are personal or in gross obligations, identifying the former as a "servitude"; and *Whittenton Mfg.* v. *Staples*, 164 Mass. 319, 328 (1895), which held that the obligations imposed by a deed, in particular the covenant to pay damages for flowage damage to a jointly owned dam, were servitudes upon the estate that could be enforced against the land to require performance to pay, but not personally against a defendant.

---

[16]The judge found that the remainder of the community continued to act as if the restrictions had not expired and still were valid, but noted that it was not until 1991 that the remaining members expressed their recommitment to the restrictions by recording their "declaration of restrictive covenants," which the Sullivans never signed.

We have been presented with no case that stands for the proposition that this equitable servitude may be enforced through a personal action against the Sullivans, and the judgment of the Land Court holds the Sullivans personally liable for the semiannual assessments of the association. Thus, so much of the judgment as holds the Sullivans personally liable for the assessments must be modified to declare that payment of the assessments to the association may be compelled against the Sullivans but only as a charge against their property and not as a personal obligation. Additionally, as found by the judge but omitted from the judgment, the judgment must be amended to add the declaration that the deed restrictions set forth in the 1929 declaration of trust, as putatively applicable to the Sullivans, thereby have expired. As so modified and amended, the judgment is affirmed.[17]

*So ordered.*

---

[17]We deny the defendant trustees' request for appellate attorney's fees.