NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

19-P-971                                          Appeals Court

WILDLANDS TRUST OF SOUTHEASTERN MASSACHUSETTS, INC.[1] vs.  CEDAR
HILL RETREAT CENTER, INC.


No. 19-P-971.

Suffolk.     May 7, 2020. - November 12, 2020.

Present:  Neyman, Englander, & Hand, JJ.


Real Property, Conservation restriction.  Practice, Civil,
    Findings by judge, Presumptions and burden of proof.
    Waiver.


    Civil action commenced in the Superior Court Department on
May 4, 2016.

    The case was heard by Kenneth W. Salinger, J.


    Emily Kanstroom Musgrave for the plaintiff.
    Jason W. Morgan for the defendant.
    Christopher A. Klem, Lillian F. McCullough, & Heather M.
Romero, for Massachusetts Audubon Society & another, amici
curiae, submitted a brief.


_____

    [1] Wildlands Trust of Southeastern Massachusetts, Inc., has
changed its name to Wildlands Trust, Inc.  Consistent with our
practice, we use the entity name that appears in the amended
complaint.

NEYMAN, J.  In this case, we interpret a conservation restriction (restriction) voluntarily placed on a parcel of real property owned by the defendant, Cedar Hill Retreat Center, Inc. (Cedar Hill).  The plaintiff, Wildlands Trust of Southeastern Massachusetts, Inc. (Wildlands Trust), contends that a Superior Court judge incorrectly construed certain provisions of the restriction, and that, as a result, the judge erred in determining that Cedar Hill did not violate the restriction.  We agree that the judge's interpretation of one provision of the restriction was inconsistent with its plain meaning.  However, we affirm the judgment because we agree with the judge that Wildlands Trust did not prove that Cedar Hill committed a breach of the restriction as properly construed.[2],[3]

Background.  In 1969, the Massachusetts Legislature enacted the Conservation Restriction Act, G. L. c. 184, §§ 31-33, which created a framework to protect conservation lands, historic properties, and agricultural lands through the use of what are essentially negative easements.  The grantor of a conservation restriction voluntarily restricts the use of its land.  See,

---

[2] As discussed below, Wildlands Trust did not preserve for appeal its claim that the judge erred in placing the burden of proof on it at trial.

[3] We acknowledge the amicus brief submitted by the Massachusetts Audubon Society and the Massachusetts Land Trust Coalition.

e.g., Goldmuntz v. Chilmark, 38 Mass. App. Ct. 696, 697-698 (1995). The grantor maintains possession but grants a nonpossessory interest in the property to a holder -- generally a government entity or charitable organization -- which agrees to protect the natural aspects of the property. See G. L. c. 184, § 32. In this manner, c. 184 furthers "the public benefits of conserving land and water in their 'natural, scenic or open condition.'" Weston Forest & Trail Ass'n v. Fishman, 66 Mass. App. Ct. 654, 658 (2006), quoting G. L. c. 184, § 31. The creation of a permanent conservation restriction requires government approval, including by the Secretary of Energy and Environmental Affairs, who must determine that the restriction is in the public interest. See generally G. L. c. 184, §§ 32-33. Conservation restrictions have become a popular tool for land conservation in the Commonwealth. There was evidence at trial that conservation restrictions currently protect more than 4,000 properties in Massachusetts.

1. The premises.[4] One such property is the approximately twelve-acre parcel on the shores of Duxbury Bay in Duxbury that is the subject of this litigation. The premises is predominantly undeveloped coastal habitat, but it also contains

---

[4] We refer to the real property at issue in this litigation as the premises, consistent with the terminology used in the restriction.

two residential buildings, a small storage shed, an unpaved driveway, and an unpaved path to the beach. The Ballou Channing District of the Unitarian Universalist Association (Ballou Channing), a religious organization, acquired the premises in the 1980s and used it for retreats and educational programs for approximately thirty years. In 2008, John and Cynthia Reed, who own an abutting parcel, paid Ballou Channing $3 million to secure a conservation restriction protecting the premises. The Reeds appreciated living next to undeveloped land and wanted to ensure that the premises "would not be developed or used in a way that would disturb their own peace and quiet." In 2009, Ballou Channing created Cedar Hill and transferred ownership of the premises to it, subject to the restriction. Today, Cedar Hill operates the premises, in part, as a retreat center, renting the buildings to companies, families, and other groups for a fee.

Wildlands Trust helped the Reeds negotiate and obtain the restriction, agreed to assume responsibility for monitoring and enforcing the terms of the restriction, and is a signatory to the restriction. Wildlands Trust is a regional land trust that works to preserve and protect native habitats, farmland, and areas of scenic value in southeastern Massachusetts. It oversees approximately 260 properties, encompassing more than 8,500 acres of protected land. It monitors properties through

annual visits and notifies the landowner if it believes there are violations of the restriction applicable to a particular property.

2. <u>The conservation restriction</u>. The restriction, which was recorded in the Plymouth County registry of deeds on October 24, 2008, states in section II[5] that its purpose is to "protect[], preserve[] and conserve[] in perpetuity [the] predominately natural, scenic, wooded and open space condition [of the Premises] . . . [,] the bird, plant, and wildlife populations on the Premises, and . . . the aesthetic and ecological condition of the Premises," while also "permitt[ing] uses described" in section III.B of the restriction.

_____

[5] Section II of the restriction, captioned "PURPOSE," states, in relevant part:

"Grantor intends that this Conservation Restriction will assure that, while permitting uses described in Section [III.B} below, the Premises will be protected, preserved and conserved in perpetuity in its predominately natural, scenic, wooded and open space condition. Grantor intends that this Conservation Restriction will preserve and protect in perpetuity (i) the bird, plant and wildlife populations on the Premises, and (ii) the aesthetic and ecological condition of the Premises. Grantor also further intends that this Conservation Restriction will prevent any use of the Premises other than for the intention mentioned above or the permitted uses described in Section [III.B]. below. Grantor additionally intends that this C[onservation ]R[estriction] will prevent those activities that would materially impair or harm the Premises or conservation interests that are the subject of this Conservation Restriction, or in any manner conflict with the maintenance of the Premises in its existing natural, scenic, wooded, open space condition."

6

To achieve its purpose, the restriction further states that the restriction will "prevent those activities that would materially impair or harm the Premises or conservation interests that are the subject of this Conservation Restriction." It then enumerates certain permitted and prohibited uses. As relevant here, the restriction, at section III.B.1, permits the premises's use "for the quiet enjoyment of nature for religious, aesthetic, non-motorized/passive recreation, scientific and/or educational purposes." Section III.B.2 states that "[t]he Premises may be used for research and programs of study in the fields relating to religion, geology, conservation, and nature." Section III.B.3 permits the premises's use "for classes, conferences, and retreats, all consistent with the Purposes set forth in Section II," discussed supra, and allows for the collection of fees "in connection with such activities." Section III.B.3 is the only provision in the restriction that permits charging a fee for use of the premises.

Section IV of the restriction makes available to Wildlands Trust certain legal remedies, including a provision authorizing Wildlands Trust to equitably enforce the restriction. That provision also sets forth a procedure for addressing alleged violations of the restriction. Specifically, section IV.A of the restriction states:

"[Wildlands Trust] shall immediately notify [Cedar Hill] in writing of the nature of the alleged violation if [Wildlands Trust] finds what it believes is a violation. Upon receipt of this written notice, [Cedar Hill] shall either (a) immediately cease the activity constituting the violation and promptly restore the [premises] to its condition prior to the violation to the satisfaction of [Wildlands Trust], or (b) immediately cease the activity and provide a written explanation to [Wildlands Trust] of the reason why the alleged violation should be permitted."

The restriction also contains, at section IV.E, an antiwaiver clause, which states that "[a]ny election" Wildlands Trust makes "as to the manner and timing of its right to enforce th[e] Conservation Restriction . . . shall not be deemed or construed to be a waiver of such rights."

Section IV.F of the restriction is a dispute resolution provision that authorizes either party to call a meeting at any time "for the purpose of resolving disputes or problems arising under this Conservation Restriction."  This provision also requires the parties to "make every reasonable effort to resolve problems or disputes to the satisfaction of both parties." Finally, the provision requires the parties, "prior to pursuing other available remedies," to attempt to negotiate any dispute "directly with each other" and, "[i]f negotiation is unsuccessful," to participate in mediation.

3.  The parties' dispute.  Shortly after Ballou Channing transferred the premises to Cedar Hill, Wildlands Trust became concerned that Cedar Hill authorized retreats on the premises

that violated the restriction. Wildlands Trust initially claimed that Cedar Hill could host only retreats that had a religious or charitable purpose. In other words, Wildlands Trust viewed family and business rentals as prohibited. Wildlands Trust also viewed overnight stays as prohibited. Over time, Wildlands Trust moderated its position. Its complaint and amended complaint alleged that the restriction did not bar retreat rentals that promoted the preservation, protection, or study of the premises. At trial, Wildlands Trust focused on what it perceived as the overuse of the premises, contending that Cedar Hill was "in effect using the [premises] as a commercial hotel or resort," exposing the premises to damage from excessive foot and vehicle traffic.[6]

Beginning in 2010, Wildlands Trust sent Cedar Hill a number of letters and e-mails and arranged meetings to discuss the perceived violations. Cedar Hill acknowledged that it had notice of some of Wildlands Trust's concerns. Nonetheless, Cedar Hill continued to rent the premises to families and businesses.[7]

---

[6] Although Wildlands Trust framed much of its trial argument in terms of overuse, its president and executive director testified throughout trial to the earlier claim that the restriction prohibits all overnight rentals of the premises, and prohibits day retreats unless the use was "religious or charitable."

[7] At various times, Wildlands Trust raised concerns about

4. <u>Superior Court proceedings</u>. On May 4, 2016, Wildlands Trust filed a five-count complaint against Cedar Hill in the Superior Court. A judge allowed Cedar Hill's motion to dismiss four of the counts, leaving only Wildlands Trust's claim for breach of the restriction.[8] On June 8, 2017, Wildlands Trust filed an amended complaint. A judge again partially allowed Cedar Hill's motion to dismiss, again leaving only Wildlands Trust's claim for breach of the restriction.

Following discovery, Wildlands Trust filed a motion for summary judgment. In his summary judgment decision, the judge[9] interpreted certain provisions of the restriction. The case then proceeded to a bench trial on Wildlands Trust's sole remaining claim against Cedar Hill, the alleged breach of the restriction. After trial, the judge issued comprehensive findings of facts and rulings of law, which incorporated his interpretation of the restriction from his earlier summary

---

other issues, including improperly parked cars, improvements to the buildings on the premises, and the cutting of trees. The judge determined that the parties resolved those concerns before trial. In any event, Wildlands Trust does not press these issues on appeal.

[8] Wildlands Trust's amended complaint also named Ballou Channing as a defendant. Wildlands Trust eventually settled its claims against Ballou Channing.

[9] The judge presiding over the summary judgment motion and the trial was not the same judge who heard and decided the motion to dismiss the amended complaint.

judgment decision. In particular, the judge ruled that the restriction "allows classes, conferences or retreats [that], at least in material []part, involve or promote the preservation, protection, study, or quiet enjoyment of the bird, plant, and wildlife population, or the aesthetic or ecological condition of the [premises] without materially . . . impairing any of these conservation interests." Based upon this interpretation of the restriction, the judge determined that Cedar Hill's rental of the premises to businesses and families did not violate the restriction because, inter alia, the renters enjoyed the premises's natural features and views during their stays.

The judge also found that Wildlands Trust had failed to give prompt written notice of certain violations and to make reasonable efforts to resolve disputes concerning alleged violations, thereby waiving its right to bring a lawsuit as to those violations. Finally, the judge found that Cedar Hill's decision to continue renting the premises to families and businesses until the parties resolved the dispute did not constitute a material breach of the dispute resolution provisions of the restriction. The judge found that any such violation was "technical" and "immaterial." The judge explained:

> "[t]o rule otherwise would be to give Wildlands Trust
> unilateral power to alter the terms of the . . .
> restriction. It would mean that Wildlands Trust could

> issue a written notice of violation based on a mistaken or even, in theory, a purely fanciful reading of the . . . restriction and that Cedar Hill would have to give up its actual rights under the . . . restriction by immediately ceasing that use of the [premises] until it could complete the dispute resolution procedure, file a civil action, and obtain a declaratory judgment that the use was permitted under the . . . restriction."

In sum, the judge found that Cedar Hill had not committed a material breach of any provision of the restriction. A final judgment, (1) declaring the allowed and prohibited uses under the restriction, and (2) ordering that Wildlands Trust was not entitled to recover damages or attorney's fees, or to obtain any permanent injunctive relief against Cedar Hill, entered in Cedar Hill's favor on April 2, 2019. Wildlands Trust now appeals from that judgment.

Discussion. Wildlands Trust argues that the judge erred in his interpretation of the restriction. Wildlands Trust also contends that the judge failed to give effect to the restriction's antiwaiver provisions, misinterpreted the cease and desist provision of the restriction, and failed to place the burden at trial on Cedar Hill to prove that the activities on the premises did not violate the restriction. We affirm the judgment because the judge did not err in determining that Wildlands Trust did not prove that Cedar Hill committed a breach of the restriction as properly construed.

In reviewing the judge's decision, we accept his findings of fact unless they are clearly erroneous. See Haskell v. Versyss Liquidating Trust, 75 Mass. App. Ct. 120, 125 (2009). However, the judge's interpretation of the meaning of the restriction's terms and provisions is a question of law. See Sullivan v. O'Connor, 81 Mass. App. Ct. 200, 204-205 (2012). See also Weston Forest & Trail Ass'n, 66 Mass. App. Ct. at 661 (conservation restrictions interpreted like deeds). We review the judge's conclusions of law de novo. Casavant v. Norwegian Cruise Line, Ltd., 460 Mass. 500, 503 (2011).

1. Breach of restriction. Wildlands Trust's primary argument on appeal is that the judge incorrectly interpreted section III.B.3 of the restriction, which specifies the classes, conferences, and retreats that may be held on the premises in exchange for a fee. Although conservation restrictions have some unique features, they are interpreted in the same manner as other recorded instruments. See Weston Forest & Trail Ass'n, 66 Mass. App. Ct. at 661. The judge must "give effect to the intent of the parties as manifested by the words used, interpreted in the light of the material circumstances and pertinent facts known to [the parties] at the time it was executed" (citation omitted). Chatham Conservation Found., Inc. v. Farber, 56 Mass. App. Ct. 584, 590 (2002). See Weston Forest & Trail Ass'n, supra. Given their conservation purposes,

restrictions "must be construed beneficially, according to the apparent purpose of protection or advantage . . . [each] was intended to secure or promote" (citation omitted). Maddalena v. Brand, 7 Mass. App. Ct. 466, 469 (1979). See Parkinson v. Board of Assessors of Medfield, 398 Mass. 112, 113 n.1 (1986). This does not mean, however, that a restriction should be read in a manner that is inconsistent with the plain meaning of its language. See Goldmuntz, 38 Mass. App. Ct. at 699. "[A]s with any contract, we 'must construe all words that are plain and free from ambiguity according to their usual and ordinary sense.'" Boston Redev. Auth. v. Pham, 88 Mass. App. Ct. 713, 717-718 (2015), quoting Suffolk Constr. Co. v. Lanco Scaffolding Co., 47 Mass. App. Ct. 726, 729 (1999).

We now apply these principles to the restriction at issue. Section III.B.3 states that "[t]he Premises may be used for classes, conferences, and retreats, all consistent with the Purposes set forth in Section II." Section II of the restriction describes its purpose, which is to "protect[], preserve[] and conserve[] in perpetuity [the] predominately natural, scenic, wooded and open space condition [of the Premises]," as well as the "bird, plant and wildlife populations" and "the aesthetic and ecological condition of the Premises." Section II further states, inter alia, that the restriction is intended to "prevent those activities that would

materially impair or harm the Premises or conservation interests that are the subject of this . . . Restriction, or in any manner conflict with the maintenance of the Premises in its existing natural, scenic, wooded, open space condition."  In other words, the purpose of the restriction is to preserve the land in its natural state, and "[i]nherent" in that purpose "are environmental concerns."  Chatham Conservation Found., Inc., 56 Mass. App. Ct. at 590.  Construing section III.B.3 according to its plain meaning and consistent with the conservation purposes of the restriction, Cedar Hill is permitted to rent the premises for classes, conferences, and retreats provided that they do not materially impair or harm the wildlife, aesthetics, or ecology of the premises or alter its natural, scenic, wooded, and open space condition.  It thus follows that classes, conferences, and retreats that would materially impair or harm these conservation concerns are prohibited.

Here, the judge conflated section III.B.3 with unrelated language from section III.B.1, which permits the use of the premises "for the quiet enjoyment of nature" under certain circumstances.  Section III.B.3 permits rental of the premises for classes, conferences, and retreats for purposes consistent with section II, but not for quiet enjoyment.  We attach meaning to the different language in sections III.B.3 and III.B.1.  See MacDonald v. Hawker, 11 Mass. App. Ct. 869, 872-873 (1981),

quoting Crimmins & Peirce Co. v. Kidder Peabody Acceptance Corp., 282 Mass. 367, 375 (1933) ("we bear in mind that '[i]t is to be presumed that parties employ all the provisions and phrases of a written contract with the purpose that each has an appropriate meaning. In interpreting contracts every word is to be given force so far as practicable'"). See also Whitecap Int'l Seafood Exporters, Inc. v. Eastern Ins. Group, LLC, 97 Mass. App. Ct. 578, 586 n.10 (2020). If the parties had intended to allow Cedar Hill to charge fees for classes, conferences, and retreats to those who wished to quietly enjoy the premises, they could have crafted language that so provided. Instead, the restriction as written authorizes fees only for classes, conferences, and retreats that are consistent with the conservation purposes of the restriction.[10]

---

[10] The judge incorrectly stated in his findings that "the conservation restriction allows Cedar Hill to charge fees for classes, conferences, or retreats that, at least in material part, involve the quiet enjoyment of the aesthetic or ecological condition of the property and that are consistent with the purposes that are laid out in the conservation restriction." The judge then declared in the judgment that the restriction "allows classes, conferences, or retreats . . . that at least in material part involve or promote the preservation, protection, study, or quiet enjoyment of the bird, plant, and wildlife populations or the aesthetic or ecological condition of the Premises, without materially impairing any of these conservation interests."

We nonetheless affirm the judge's finding that Cedar Hill's retreat rentals did not constitute a breach of the restriction. Wildlands Trust's argument to the contrary rests on a narrow reading of section III.B.1 that would limit retreat rentals to those that affirmatively promote conservation. That interpretation ignores the restriction's plain language and stated intent. As discussed, section II states as one of the restriction's purposes the intention that the restriction "will prevent any use of the Premises other than for the intention mentioned above or the permitted uses described in Section [III.B] below," as long as such uses do not include "activities that would materially impair or harm the Premises or conservation interests that are the subject of this . . . Restriction, or in any manner conflict with the maintenance of the Premises in its existing natural, scenic, wooded, open space condition." (Emphasis added.) Neither this language nor any other provision dictates, as Wildlands Trust claims, that "such uses are allowed only if they are focused on 'preserv[ing] and protect[ing]' the land."

Under the proper interpretation of the restriction, the evidence at trial did not show that the retreats held at the premises were inconsistent with the "[p]urposes set forth in Section II" of the restriction. Specifically, the evidence did not show that any retreat or conduct at any retreat was

inconsistent with the protection, preservation, and conservation in perpetuity of the premises "in its predominately natural, scenic, wooded and open space condition." The evidence likewise did not show that the retreats or conduct at any retreat was inconsistent with the preservation or protection in perpetuity of "the bird, plant and wildlife populations on the Premises, and . . . the aesthetic and ecological condition of the Premises." Indeed, much of the evidence was to the contrary.[11]

Although there is a measure of persuasiveness to Wildlands Trust's argument that the sheer number of retreat rentals Cedar Hills hosts each year threatens to negatively impact the premises, or is inconsistent with the purposes of the restriction, the evidence at trial did not establish such harms

---

[11] Although we discern no ambiguity in the terms of the restriction, to the extent any terms may be equivocal, we note that Wildlands Trust's interpretation of the restriction also ignores the evidence of the circumstances surrounding its execution. See Winchester Gables, Inc. v. Host Marriott Corp., 70 Mass. App. Ct. 585, 591 (2007) ("[W]here a contract is so expressed as to leave its meaning obscure, uncertain or doubtful, evidence of the circumstances and conditions under which it was entered into are admissible, not to contradict, enlarge or vary its terms by parol, but for the purpose of ascertaining the true meaning of its language as used by the parties" [citation omitted]). When the restriction was being negotiated, all parties were aware that Ballou Channing had been using the premises for retreats. That retreats are one of the restriction's few categories of permitted uses suggests that the parties wanted to preserve the ability of Ballou Channing and its successors to host such retreats. The conservation purposes of the restriction were thus protected by prohibiting retreats to the extent they impaired the purpose of the restriction.

from such use. Instead, Wildlands Trust focused at trial on the nature of the rentals and their lack of any charitable or conservation purpose. That evidence did not establish that Cedar Hills overused the premises such that it "materially impair[ed] or harm[ed]" the wildlife or aesthetic and ecological condition of the premises, or altered its "predominately natural, scenic, wooded and open space condition." Accordingly, the judge did not err in determining that Cedar Hill's use of the premises for family or business retreats did not constitute a breach of the restriction.

2. _Waiver_. Wildlands Trust argues that the judge erred when he found that it had waived its right to challenge retreat rentals that occurred before 2016 because (1) the defense of waiver is inapplicable to claims advancing public rights, and (2) the judge ignored the antiwaiver provision in the restriction. Here, even assuming that the judge erred in concluding that Wildlands Trust had "waived" some of its claims, we do not vacate the judgment because we agree with the judge's alternative holding that none of the pre-2016 rentals constituted a breach of the restriction. Wildlands Trust's claims relating to pre-2016 rentals depend upon its narrow reading of the restriction, a reading we reject, _supra_. Because the restriction permits overnight retreat rentals to business and family groups, Wildlands Trust cannot prevail on the merits

of its claims related to pre-2016 rentals, even if it had not "waived" them.[12]

3. <u>Cease and desist provision</u>.  Wildlands Trust also argues that the judge erred when he found that Cedar Hill's decision to continue to use the premises for overnight retreats, pending resolution of the parties' dispute, did not constitute a material breach of the restriction.  According to Wildlands

---

[12] We note that equitable defenses such as waiver may not be available in actions of this kind because holders of conservation restrictions file suit to protect a public, not private, right.  See <u>Weston Forest & Trail Ass'n</u>, 66 Mass. App. Ct. at 657-660 (laches and estoppel inapplicable to claims by grantee enforcing conservation restriction because restriction protects public benefit).  Assuming a waiver defense is available, the better approach in the context of analyzing a conservation restriction is for a judge to consider what impact, if any, the restriction's antiwaiver clause had on his analysis, prior to making a finding of waiver.  We further note that "[u]nder the common law of contracts, waiver is the 'intentional relinquishment of a known right'" (citation omitted).  <u>BourgeoisWhite, LLP</u> v. <u>Sterling Lion, LLC</u>, 91 Mass. App. Ct. 114, 119 (2017).  "Waiver may occur by an express and affirmative act, or may be inferred by a party's conduct, where the conduct is 'consistent with and indicative of an intent to relinquish voluntarily a particular right [such] that no other reasonable explanation of [the] conduct is possible.'"  <u>KACT, Inc</u>. v. <u>Rubin</u>, 62 Mass. App. Ct. 689, 695 (2004), quoting <u>Attorney Gen</u>. v. <u>Industrial Nat'l Bank</u>, 380 Mass. 533, 536 n.4 (1980).  Whether a party has waived a provision of a contract -- either expressly or implicitly -- is a question of fact.  See <u>M.J.G. Props., Inc</u>. v. <u>Hurley</u>, 27 Mass. App. Ct. 250, 252 (1989).  While an antiwaiver clause is not dispositive, fact finders must decide the question of waiver "in light of all the circumstances, including the existence of the antiwaiver clause."  <u>Id</u>.  See <u>Corcoran Mgt. Co</u>. v. <u>Withers</u>, 24 Mass. App. Ct. 736, 745-746 (1987) (noting that antiwaiver provision was "very important" to trial judge's waiver analysis).

Trust, the judge's "interpretation nullifies a key provision in the Restriction."

By its plain language, section IV.A of the restriction requires that, upon receipt of a violation notice, Cedar Hill must "immediately cease the activity constituting the violation" and either (1) "promptly restore the [premises] to its [prior] condition" or (2) "provide a written explanation to [Wildlands Trust] of the reason why the alleged violation should be permitted."  We disagree with the claim that the judge's interpretation of the "immediately cease" language of section IV.A rendered the provision a nullity.  The judge explicitly focused his analysis of the cease and desist provision on "past violations that are asserted in this suit by Wildlands Trust," rather than future violations.[13]  Contrary to Wildlands Trust's claim, nothing in the judge's decision prevents Wildlands Trust from enforcing the cease and desist provision going forward. Should Cedar Hill violate the restriction in the future and fail

_____

[13] As to the alleged past violations, we recognize the judge's concern that Wildlands Trust's proffered interpretation of the cease and desist provision was untenable because "[i]t would mean that Wildlands Trust could issue a written notice of violation based on . . . a purely fanciful reading of the conservation restriction."  Nevertheless, the restriction must be read in accordance with its plain language.  As the judge noted, going forward, a notice of alleged violation from Wildlands Trust, followed by Cedar Hill's failure to immediately cease the challenged activity, may result in a different outcome, pending the specific facts at issue.

to immediately cease the challenged use, Wildlands Trust has the ability to seek a preliminary injunction or other immediate equitable relief. See, e.g., Smith v. Westfield, 478 Mass. 49, 53 (2017) (judge granted preliminary injunction preserving land as playground pending decision whether city could convert land to school). See also G. L. c. 184, § 32 (conservation "restriction may be enforced by injunction or other proceeding"). We note that the record before us does not reflect that Wildlands Trust sought an immediate preliminary injunction or emergency equitable relief, further underscoring that the judge's analysis does not apply to situations where Wildlands Trust is seeking equitable relief before there has been a decision on the merits of any claim for an alleged violation of the restriction.[14]

Even assuming, arguendo, that Cedar Hill's failure to cease its alleged violations during the pendency of the parties'

---

[14] We note that section IV.B of the restriction states that "[t]he parties agree that any enforcement action will not be undertaken until the parties have completed dispute resolution procedures set forth in Section IV (F)" of the restriction. That provision requires the parties to negotiate "directly with each other" and, in the event they are unable to resolve their dispute, "to participate in at least three hours of mediation." We recognize that the cease and desist provision in section IV.A and the dispute resolution provision might lie in uneasy tension. We also recognize the potential tension between these provisions and G. L. c. 184, § 32. That notwithstanding, these issues have not been briefed by the parties, and we need not resolve here how they may interact in other circumstances.

dispute violated the restriction, Wildlands Trust cannot prevail on its claim for breach of section III of the restriction, because Cedar Hill's use of the premises for retreats was found to be a permitted use. The record reflects that Wildlands Trust did not establish material impairment or harm to the premises due to unpermitted use during the pendency of the dispute, and Wildlands Trust cannot establish the damages element of its claim for breach of the restriction. See, e.g., Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (2016) ("To prevail on a claim for breach of contract, a plaintiff must demonstrate [inter alia] that . . . the plaintiff suffered harm as a result [of the breach]").[15]

4. Burden of proof. Wildlands Trust argues that the judge misallocated the burden of proof at trial. Specifically, it contends that the judge should have placed the burden on Cedar Hill to prove that its use of the premises was a permitted use under the terms of the restriction. This argument is waived.

To preserve a claimed error for appellate review, a party must make "a specific objection on point" before the trial

---

[15] In its appellate brief, Wildlands Trust does not argue that Cedar Hill's breach of section IV.A's procedural requirements, standing alone, entitles Wildlands Trust to nominal damages and attorney's fees under section IV.B, notwithstanding our determination that Cedar Hill did not violate section III's substantive provisions. We therefore need not decide whether such a procedural violation by itself would entitle Wildlands Trust to attorney's fees.

judge.  Matsuyama v. Birnbaum, 452 Mass. 1, 35 (2008).  The objection "must be made sufficiently timely so that the judge can reflect upon the objection and correct [any] mistake."  Anderson-Mole v. University of Mass., 49 Mass. App. Ct. 723, 726 (2000).  Here, Wildlands Trust did not timely raise any concerns about the judge's allocation of the burden of proof until after the judge announced his findings of fact and conclusions of law.[16]

Conclusion.  We conclude that none of Wildlands Trust's arguments warrant reversal.  The case is remanded for the modification of the judgment consistent with this opinion, and as so modified, the judgment is affirmed.

So ordered.

_____

[16] Contrary to Wildlands Trust's argument, the record reveals that the parties approached and tried the case in a manner consistent with the understanding that the burden rested with Wildlands Trust.